**CHICAGO AND WESTERN INDIANA RAILROAD COMPANY, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 13509.**

United States Court of Appeals
Seventh Circuit.

May 1, 1962.

Rehearing Denied July 30, 1962.

Harold A. Smith, David J. Hardy, James D. Head, Charles F. Marquis, Chicago, Ill., Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel, for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Robert L. Waters, Atty., Tax Div., Lee A. Jackson, Joseph Kovner, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, and DUFFY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

Taxpayer, Chicago and Western Indiana Railroad Company, an Illinois Corporation, appeals from a decision of the Tax Court which upheld a determination by the Commissioner of Internal Revenue that there were deficiencies in taxpayer's federal income tax for the years 1950 and 1951 in the respective amounts of $361,-191.04 and $326,882.60. The import of

the Tax Court's ruling was that taxpayer had either failed to include in income $1,038,403.65 for the taxable year 1950 and $682,339.63 for the taxable year 1951 or, in the alternative, that taxpayer had taken unallowable deductions in like amounts as ordinary and necessary business expenses.

Taxpayer was incorporated under the laws of Illinois in 1882. Its 50,000 shares of voting common stock are held equally by five railroad companies: Chicago and Eastern Illinois Railroad Company; Chicago, Indianapolis and Louisville Railway Company; Erie Railroad Company; Grand Trunk Western Railroad Company; and the Wabash Railroad Company.

Taxpayer owns a multiple track terminal railroad system in and around Chicago. The system is divided into two divisions known as the Terminal Division and the Belt Division.

The Terminal Division consists of 101 miles of main track, 110 miles of yards and sidings and the Dearborn Station. The freight and terminal facilities of the Terminal Division are used primarily by the shareholder railroads.[1] Taxpayer, as a part of its Terminal Division, also furnishes various services to its shareholders such as the switching, repairing, and servicing of equipment necessary in preparing shareholders' trains for outbound movement.

The Belt Division consists of 53 miles of main tracks and 310 miles of yards and sidings. The taxpayer's Belt Division property is leased to the Belt Railway Company under an agreement entered into November 1, 1912 which has been supplemented from time to time to include additions to the leased property. The shareholders do not operate over the Belt Division.

The lease agreements require the Belt Railway Company to pay the cost of the management, operation, maintenance, repair, renewal, and insurance of, and all taxes, liens and assessments on the Belt Division; an annual rental of $854,-248.31; and the interest on all outstanding obligations of taxpayer the proceeds of which have been used for additions and betterments to the Belt Division.

Taxpayer and its shareholders entered into an inter-tenant agreement November 1, 1882 defining the terms under which the shareholders, as lessees, were to use the Terminal Division property in common. The agreement obligated the shareholders to pay taxpayer the costs of operating the common facilities. The costs were to be apportioned among the shareholders in accordance with various formulae; some costs were apportioned on a wheelage basis and other costs on a proprietary or equal basis.

Because each shareholder's business developed differently it became advantageous for some shareholders to pay rental on a wheelage basis and for others on an equal basis. For this reason the allocation of expenses under the formulae of the 1882 agreement eventually led to disputes and protracted litigation between taxpayer and certain shareholders and even among the shareholders themselves.

In 1947 litigation between taxpayer and one of its shareholders was pending in the District Court for the Northern District of Illinois pursuant to a mandate following a decision of this Court construing the 1882 agreement. Chicago & W. I. R. Co. v. Chicago & E. R. Co., 7 Cir., 140 F.2d 120, 126. In that case this Court held that:

"The decree to be entered should provide that [taxpayer] should re-

---

1. Certain facilities of the Terminal Division are made available to railroads other than the shareholders. The Belt Railway Company has trackage rights over 18 miles of the Terminal Division; the Atchison, Topeka & Santa Fe Railway Company uses the Dearborn Station and the approach tracks thereto; the Elgin, Joliet and Eastern Railway operates over five miles of the Terminal Division line; and a portion of the Dearborn Station is leased to Fred Harvey, a corporation, and to the Railway Express Agency. Taxpayer also operates for its own account an industrial switching service and a limited suburban passenger service between the Dearborn Station and Dolton, Illinois.

state its account charging some of the lessees with the difference between what they have paid and what they should pay on a wheelage basis, and crediting others with the difference between what they have paid on an equal basis, and what they should have paid on a wheelage basis. * * * ''

After the mandate had been issued, further controversy developed between taxpayer and its shareholders and among the shareholders themselves with respect to how the mandate should be carried out. Counsel for taxpayer anticipated further appeals consuming an estimated two or three years. A $50,000,000 bond issue of taxpayer was due in 1952 and taxpayer's counsel believed that if the litigation was not resolved the bond issue could not be refinanced and that the probable result would be taxpayer's reorganization. Because of these difficulties the parties sought an out-of-court settlement ending the litigation.

Negotiations among the shareholders and taxpayer for the purpose of reaching a settlement culminated in an agreement on December 31, 1947 which amended the 1882 agreement. The 1947 agreement was submitted to and approved by the Interstate Commerce Commission and in 1948 the litigation was dismissed on stipulation of the parties.

The 1947 agreement clarified provisions of the 1882 agreement which experience had shown were the cause of misunderstanding and litigation. This clarification was accomplished by charging certain types of expenses, formerly borne by taxpayer, directly to the shareholders; by adopting a definition of proprietary expenses (to be borne equally by shareholders); by defining additional zones for computing wheelage charges; and by adopting a procedure to prevent and resolve future controversies.

More pertinent to the issues presented in the instant appeal, the 1947 agreement cancelled paragraph 11 of the 1882 agreement which read as follows:

"11th. * * * and as [taxpayer] will have income from other sources, which may properly be divided among its stockholders * * * it is hereby agreed that, at the close of each quarter year, beginning from the date of this instrument, [taxpayer] shall divide, equally, between the [shareholders], and pay to them as its shareholders, all money received by it, from whatever source, except * * * that which may be paid to it by the [shareholders] on account of 'working expenses.' * * * ''

Paragraph 11 of the 1947 agreement, which replaced the foregoing provision, reads:

"11. All revenues, income and profits accruing to [taxpayer] (including retirement losses on depreciable property, but excluding profits from the sale or other disposition of property held under exclusive lease by any of the [shareholders]), except those which may be paid to it on account of expenses or other obligations, shall be disposed of and applied by [taxpayer] as follows:

"(a) The revenues from concessions and privileges in respect to passenger stations shall be applied as a credit monthly to the cost of operating the respective stations to which the concessions and privileges attach.

"(b) The remainder shall be paid in equal proportions of one-fifth each to the [shareholders] and shall be credited monthly and applied as reductions of their rental obligations under leases and supplemental leases between [taxpayer] and the several [shareholders]."

The Tax Court found that taxpayer in accordance with paragraph 11 of the 1947 agreement reduced the accounts representing receivables from the shareholders and allocated like amounts among various expense and income accounts so as to reduce its revenue, income and profits in 1950 by $1,038,403.65 and in 1951 by $682,339.63. The court further found that the above amounts were derived from taxpayer's transactions with nonshareholder users of its property and

capital transactions and that absent the above reductions the taxpayer's income would have been proportionally higher for each of the two years. These findings underlie the ruling of the Tax Court upholding the Commissioner's determination of the deficiencies in taxpayer's returns.

## I.

Taxpayer contends that the effect of paragraph 11 of the 1947 agreement was to reduce the amounts which the shareholders were legally obligated to pay as rent and, since taxpayer was on an accrual basis, it was not required to report as income the entire amount due under the leases between taxpayer and its shareholders because taxpayer was legally entitled to receive only the amount that the shareholders were billed for after the nonshareholder income was credited to the shareholders' accounts.

The Commissioner, on the other hand, contends that paragraph 11 did not reduce the shareholders' obligations under the leases but only provided a different manner of discharging their respective obligations; that the shareholders' actual obligations under their various leases were not changed by the 1947 agreement but, rather, the agreement provided that part of the shareholders' obligations would be discharged by the application thereto of taxpayer's nonshareholder income; and therefore it was improper for taxpayer to include in its income *only* the amount of its shareholders' rental obligations which was paid in cash [2] and to leave out that portion of the shareholders' rental obligations discharged by crediting their accounts in an amount equal to taxpayer's nonshareholder income.

The Commissioner concedes that the 1947 agreement was not a sham, but does maintain that the purpose of the parties to the agreement in changing paragraph 11 from its original version was to permit taxpayer to distribute its nonshareholder income in such a way

as to avoid paying a tax on such income. Taxpayer, in reply, stresses the fact that the agreement was approved by the Interstate Commerce Commission as being just, reasonable, and consistent with the public interest; therefore, taxpayer argues the agreement must be considered to have that commercial reality which makes immaterial the fact that one of the motives for the agreement may have been tax avoidance, citing Maysteel Products, Inc. v. Commissioner, 7 Cir., 287 F.2d 429.

While the Commissioner contends the 1947 agreement was not an arm's length transaction, we find it unnecessary to decide whether it was or not because we believe the proper construction of paragraph 11 does not permit taxpayer to omit from its reported income the amount which represents the nonshareholder income. For the same reason we find it unnecessary to decide whether the motives of the parties in changing paragraph 11 were solely to avoid income taxes or were to accomplish independent business objectives aside from the avoidance of income taxes.

The pertinent part of paragraph 11 of the 1947 agreement provides that:

"(b) The remainder shall be paid in equal proportions of one-fifth each to the [shareholders] and shall be credited monthly and applied as reductions of their rental obligations under leases and supplemental leases between [taxpayer] and the several [shareholders]."

This provision clearly requires that the nonshareholder income be "paid" proportionally to each of the shareholders by crediting and reducing their respective rental obligations. The verb "paid" appearing in the forepart of the provision indicates that a distribution of the nonshareholder income was intended. The latter part of the provision indicates that the distribution, instead of being paid in the form of a dividend as required by the 1882 agreement, is to be paid by

---

**2.** See the concurring opinions of Judges Turner and Withey in Anaheim Union Water Co. v. Commissioner, 35 T.C. 1072.

the method of crediting the shareholders' accounts. In an accounting sense the shareholders' rental obligations can be said to be reduced by this method. For tax purposes, however, it does not follow that the part of the rental obligations arising from the lease agreements which is paid by means of crediting the shareholders' accounts to the extent of nonshareholder income can be treated as not having accrued as income to the taxpayer. This is so because the credits extended to the shareholders by this method represent in substance partial prepayments of their rental obligations.

Furthermore, it is apparent from an inspection of taxpayer's accounting method that paragraph 11 did not serve to change the extent of the obligations assumed by the shareholders under their various leases. Taxpayer's auditor testified that the revenues, income and profits from nonshareholder sources were determined monthly and that these amounts were credited in one-fifth shares to the accounts of the shareholders. This credit was then applied to the amount due from each shareholder under the various leases thereby reducing the billing made by taxpayer and determining the amount of cash forthcoming from the shareholder. Taxpayer then debited its joint facility rent income account in the total amount of the credits to the shareholders. The combination of crediting shareholders' rental accounts in the amount of nonshareholder income and debiting taxpayer's income account in a like amount left taxpayer without a surplus at the end of the year, but it did not serve to diminish taxpayer's income.

Taxpayer's accrued income is that which it was entitled to receive under the leases, not that which it received in response to its billings to shareholders.

We hold that taxpayer, in debiting its income accounts by the amounts credited to its shareholders, improperly understated its income in the amounts stated in the deficiency notice for the years 1950 and 1951.

## II.

The deficiency notice to taxpayer stated that the Commissioner had added to taxpayer's income "net income" which it failed to include in its returns. Taxpayer's failure to include net income in its returns could arise either from an exclusion of gross income or an improper deduction. Consequently, the Commissioner contends as an additional ground for decision that even if taxpayer were correct in its contention that the crediting of shareholders' accounts with nonshareholder income reduced the amount of rental income accruing to taxpayer, then it is readily perceived that taxpayer was bound to render services and provide facilities for the benefit of the shareholders for a remuneration less than the costs incurred in providing those services and facilities; that absent paragraph 11 of the 1947 agreement taxpayer would have been entitled under the terms of the various leases to recover all its costs in providing the shareholders with services and facilities; that if paragraph 11 is considered to reduce to the extent of nonshareholder income the amount recoverable from the shareholders, it then follows that the shareholders received services and facilities (to the extent of the nonshareholder income credited to their accounts) without paying for them. Upon these premises the Commissioner concludes that the expenses incurred by taxpayer in providing services and facilities which the shareholders were not required to pay for were not ordinary and necessary business expenses within the meaning of Section 23(a) (1) (A) of the Internal Revenue Code of 1939, as amended by the Revenue Act of 1942, 26 U.S.C. § 23.[3] The Commissioner cites Anaheim

3. "§ 23 *Deductions from gross income.*
  "In computing net income there shall be allowed as deductions:
  "(a) *Expenses.*
  "(1) *Trade or business expenses.*

  "(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *."

Union Water Co. v. Commissioner, 35 T.C. 1072, as authority for his contention.

In Anaheim the taxpayer was a water cooperative formed to provide water to its shareholders at cost for irrigation purposes. After some years of operation the taxpayer began to derive substantial income from oil royalties. It then proceeded to expend its royalty income by setting its water prices to shareholders at a price sufficiently below cost so that the royalty income offset the deficit in supplying water to shareholders. The Tax Court held that the costs incurred in supplying the water to shareholders were not "ordinary and necessary" business expenses to the extent they exceeded the price obtained from the shareholders.

Another "nonprofit" corporation, servicing Anaheim and involved in the Anaheim case, Santa Ana River Development Company, also had nonshareholder income in the form of land rental revenues. Santa Ana was required by agreement to furnish its shareholders (one of whom was Anaheim) water services at less than cost inasmuch as the nonshareholder income was required to be deducted from its water service expenses before the shareholders were billed for these expenses. In arriving at the same conclusion with respect to Santa Ana as it did with respect to Anaheim, the Tax Court said:

"It is no more 'ordinary and necessary' for a corporation by agreement to expend more for its services than it is paid than it is to do the same thing without an agreement. * * * A corporation which charges its shareholders less than cost for its goods or services and uses otherwise taxable income to pay for the expense differential is, in effect, merely making a distribution of such taxable income to the shareholders without a formal declaration of dividends."

Viewing the facts in the instant case from the standpoint of whether there was a proper deduction for "ordinary and necessary" business expenses as distinguished from whether there was an exclusion of gross income, we agree with the principles stated in Anaheim and, although there are some factual dissimilarities between Anaheim and the instant case, we believe that the two cases cannot be legally distinguished. Accordingly, looking at the case from this viewpoint, we hold that to the extent that taxpayer credited its shareholders with nonshareholder income it may not treat its expenses in providing services and facilities to its shareholders as "ordinary and necessary" business expenses.

III.

Taxpayer asserts that the Tax Court's determination that it omitted from income $1,038,403.65 in 1950 and $682,339.63 in 1951 is erroneous also because, contrary to the finding made by that court, these amounts were not comprised solely of net nonshareholder income. Taxpayer argues that these amounts are erroneous in three respects: (1) The entire revenue from the suburban and freight operations were included in the nonshareholder income, but the entire expenses attributable to these operations were not allowed. (2) Since a portion of the nonshareholder income was derived from the properties leased to the Belt Railway Company, allowance should have been made for depreciation of these properties. (3) Certain amounts included in the Tax Court's determination of omitted income were paid to taxpayer by its shareholders and therefore should not be classified as nonshareholder income.

For reasons that follow, we believe it unnecessary to determine whether the amounts of income omitted by taxpayer in its 1950 and 1951 returns were comprised entirely of net nonshareholder income.

In the initial proceeding before the Tax Court there was no dispute over the amounts omitted from income in taxpayer's returns for the years in question; rather, the dispute was whether the

agreed amounts should have been included in income. In its petition before the Tax Court taxpayer stated, "In accordance with the provisions of the 1947 agreement, Petitioner paid or credited to the accounts of the [shareholders] the following receipts * * * which payments or credits served to reduce the amounts otherwise payable by [the shareholders] for the common use of a portion of Petitioner's property. * * * " The credits referred to by taxpayer were $1,038,403.65 in 1950 and $669,974.99 [4] in 1951—the same amounts which the Commissioner contended and the Tax Court found were improperly omitted from income.

The question concerning the correctness of the amounts added to taxpayer's income by the Commissioner was raised for the first time in taxpayer's motion before the Tax Court for reconsideration of its decision. Up to then taxpayer appears to have conceded affirmatively by its petition filed in the Tax Court and at least tacitly throughout the proceeding that the amounts of allegedly omitted income were not in question; it questioned only the Commissioner's determination that these amounts were includable in taxpayer's income. We believe taxpayer's position as to the correctness of the amounts is wholly untenable.

The amounts credited to the shareholders' accounts during the years in question pursuant to the terms of the 1947 agreement are not in dispute. They are reflected in taxpayer's accounts in the amounts stated in its petition filed in the Tax Court and they are the exact amounts of the omitted income found by the Tax Court.

■ We have held that these undisputed amounts credited to the shareholders were improperly omitted from income because absent such credits these amounts were *otherwise payable by the shareholders* pursuant to their various leases and thus reflected income which legally accrued to taxpayer. Therefore, the omitted amounts are includable in taxpayer's income irrespective of whether or not they equate with net nonshareholder income.

If such omitted amounts were inflated by taxpayer by adding sums not properly classified as net revenues from nonshareholder sources, it cannot now take advantage of its own mistakes, however they came about, because such inflation served only to reduce the amounts "otherwise payable by the shareholders", and to increase the amounts of omitted income.

The decision of the Tax Court is affirmed.

---

4. This amount was later changed by stipulation to $682,339.63.