**ANAHEIM UNION WATER COMPANY,
Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**SANTA ANA RIVER DEVELOPMENT
CO., Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 17484.

United States Court of Appeals
Ninth Circuit.
July 2, 1963.

Dana Latham, Henry C. Diehl, and Max L. Gillam, Los Angeles, Cal., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Joseph Kovner, and Charles B. E. Freeman, Attys., Dept. of Justice, Washington, D. C., for respondents.

Before HAMLIN and MERRILL, Circuit Judges, and WALSH, District Judge.

WALSH, District Judge.

The petition for review in these cases involves income taxes of petitioners Anaheim Union Water Company (hereinafter "Anaheim") and Santa Ana River Development Company (hereinafter "SARD") for the years 1952, 1953, and 1954.

On December 12, 1957, the Commissioner of Internal Revenue (hereinafter "Respondent") mailed to Anaheim a notice of deficiency, advising that for the years 1952, 1953, and 1954, he had determined deficiencies in the respective amounts of $39,219.33, $35,009.46, and $35,366.29. On the same date, Respondent notified SARD by mail that for the years 1952, 1953, and 1954 he had determined deficiencies in the respective amounts of $2,274.34, $3,114.28, and $5,-306.44. On March 6, 1958, Anaheim and SARD filed separate petitions with the Tax Court of the United States, pursuant to Section 6213, Internal Revenue Code, 1954, seeking redeterminations of the deficiencies. Both cases were consolidated for trial in the Tax Court and were decided in a single opinion of the Court wherein the deficiencies determined by Respondent as to both Anaheim and SARD were sustained. 35 T.C. 1072.

Anaheim and SARD then filed in this court a joint petition for review of the decision of the Tax Court. This court has jurisdiction of the cases under the provisions of Section 7482, I.R.C., 1954.

Anaheim was organized in 1884 as a California mutual irrigation corporation for the purposes of developing water, acquiring water and water rights, and selling and distributing water to its shareholders on lands within a described 12,-000 acre district. Though its original articles of incorporation did not describe Anaheim as a non-profit corporation, California law apparently deemed it such. McFadden v. Board of Supervisors, 74 Cal. 571, 16 P. 397 (1888); McDermont v. Anaheim Union Water Company, 124 Cal. 112, 56 P. 779 (1899). In any event, during the years pertinent here, its articles of incorporation as amended in 1934 provided that the objects for which the corporation was formed were:

"The supplying of water at cost for hydraulic, irrigating and domestic use to its stockholders who are the owners of, or occupants of, land situate in the County of Orange, State of California, and contained within the following described boundary * * *. Also the keeping up and maintaining of the irrigating ditches, known as the Cajon and Anaheim Ditches; the developing of water, the acquiring of water and water rights by purchase, appropriation or otherwise; the acquiring of and construction of reservoirs, ditches, aqueducts, flumes and any and all other property and works necessary to the carrying on of the business of furnishing water without profit for the purpose and within the limits aforesaid, and for the delivery and distribution of water at cost to the stockholders of the corporation within the limits aforesaid." [1]

Anaheim's by-laws in force during the period from 1944 to November 15, 1954, provided that:

"Sec. 1. The corporation shall be conducted as a mutual non-profit water company, for the purpose of maintaining an adequate water supply and furnishing water at cost to its stockholders. All income of the corporation shall be used to accomplish said purposes."

By-laws effective November 15, 1954, provided that:

"Section 3. This corporation is a mutual non-profit company conducted for the purpose of maintaining an adequate water supply and distribution system and furnishing and delivering water to its shareholders, without profit. All income of the corporation shall be used solely to accomplish said purposes."

In its operations, Anaheim diverts one-half of the surface flow of the Santa Ana River into a canal wherein it moves into two storage reservoirs. The water is carried from the reservoirs to Anaheim's shareholders through distribution lines. The shareholders use the water solely for agricultural purposes, and none of it is resold. During the period 1952–54, Anaheim had approximately 700 shareholders. In 1952, approximately 550 of the shareholders purchased water, but this number decreased to 500 in 1954. Each shareholder was entitled to buy a certain amount of water per share per month, the amount being fixed in the by-laws of the corporation and the price being set by Anaheim's Board of Directors. Additional water beyond the shareholders' allotment could be purchased by paying an extra rate. The shares are not appurtenant to the land; and it was permissible for a shareholder to rent shares from other shareholders in order to purchase water at the basic rate.

1. Regardless of the non-profit character of Anaheim under California law and by virtue of the provisions of its articles of incorporation and by-laws, it is not disputed that it is a taxable corporation under federal income tax laws. Although at one time Anaheim had tax exempt status, the exemption was withdrawn in 1939 because less than 85% of its income was received from its shareholders.

To carry out its corporate purposes and objects, in the years since its organization Anaheim has acquired lands which, though not acquired for investment or income purposes, have turned out to be sources of income to Anaheim. Some of the lands have become valuable for oil and gas purposes and during the years 1952–54 brought Anaheim income in the form of oil royalties. Other lands have been the source of rental income and, in addition, Anaheim has had some miscellaneous income. The whole of this income—from oil, from rentals, and from miscellaneous sources—plus Anaheim's income from sales of water to its shareholders were all devoted in the period 1952–54 to the payment of Anaheim's expenses incurred in the conduct of its business during such period. Respondent in determining deficiencies against Anaheim as hereinbefore stated, determined that the expenses incurred by Anaheim in delivering water to its shareholders were not deductible ordinary and necessary business expenses incurred by Anaheim to the extent that they exceeded the proceeds received by Anaheim from the sale of the water.

Santa Ana Valley Irrigation Company (hereinafter "SAVI"), another mutual irrigation company, has operated for many years in an area adjacent to that of Anaheim, diverting the other half of the surface flow of the Santa Ana River for irrigation purposes. Between 1900 and 1907, Anaheim and SAVI jointly purchased several tracts of land upstream from their respective diversion points to protect their interests in the flow of the Santa Ana River.

In 1907, SARD was organized by Anaheim and SAVI as a Nevada non-profit corporation in order to facilitate the successful conduct of their irrigation operations. During the period pertinent here, there were issued and outstanding 28 shares of SARD's capital stock, par value $100.00 per share, 14 shares being owned by Anaheim and the other 14 by SAVI. Since its organization, SARD has held title to upstream riparian lands and has carried on operations upstream to increase the flow of the Santa Ana River at the diversion points of Anaheim and SAVI. For this purpose, SARD cleared brush, cleaned and cemented channels, drilled wells, and pumped water under a dam in the Santa Ana River. SARD has a five man board of directors, three appointed by SAVI and two by Anaheim. A vote of four directors is required before SARD can take any action other than the payment of bills in the amount of $500.00 or less. Any expenditure in excess of $500.00 must receive independent approval from the boards of Anaheim and SAVI.

At the time of SARD's incorporation in 1907, Anaheim and SAVI conveyed the then jointly held upstream lands to SARD for a stated consideration of $150,000.00; and Anaheim and SAVI each received from SARD a demand note for $75,000.00 bearing interest at the rate of 5% per annum. Contemporaneously, SARD contracted to render certain water services to Anaheim and SAVI for $7,500.00 per year [2] plus any expenses incurred by SARD. In 1909, the 1907 contract was amended to provide that any income from the upstream lands conveyed to SARD would be applied against SARD's expenses. By agreement entered into in January, 1944, SARD agreed that its water services would be furnished to Anaheim and SAVI and in consideration thereof Anaheim and SAVI would each pay one-half of SARD's operating expenses after SARD had applied toward such expenses any rents, issues, and profits which it might take from the lands owned by SARD. Through the years after 1907, SARD purchased additional upstream lands at the instruction of Anaheim and SAVI, with funds furnished equally by Anaheim and SAVI

In 1940, SARD conveyed an undivided one-half interest in certain lands to each

2. A sum equal to the annual interest due on SARD's notes.

of its shareholders. In 1949, a one-sixth interest in these lands was reconveyed to SARD by Anaheim and SAVI in order to permit SARD to rent the lands and take part in threatened litigation concerning water rights.

During all of the years in issue, SARD leased the co-tenancy lands, receiving all of the rentals. The total income received by SARD, its expenses, and the charges it made to Anaheim and SAVI, its stockholders, during these years were:

| Year | Total Income | Expenses | Charges to Stockholders |
|------|------|------|------|
| 1952 ............ | $25,458.20 | $31,349.77 | $ 5,891.57 |
| 1953 ............ | 25,341.33 | 40,426.46 | 15,085.13 |
| 1954 ............ | 18,861.48 | 39,818.13 | 20,956.65 |

For the years 1952 and 1953, SARD reported as income in its federal tax returns all of its rental receipts, including all of those from the co-tenancy lands; and Anaheim reported none of the rentals as income in its returns. For 1954, SARD actually retained all of its rental receipts but reported as "rents received" in its income tax return only the percentage of the rentals which equalled the percentage of its record ownership of the rented lands. The balance of the rental receipts it included as a deduction from expense, described as "Recovered from Stockholders".

In determining the deficiencies against SARD and Anaheim for 1952 and 1953, Respondent deducted from rental income reported by SARD the rental income attributable to Anaheim's and SAVI's interest in the co-tenancy lands and he deducted from the expenses reported by SARD the expenses attributable to Anaheim's and SAVI's interest in such lands. Also, Respondent added to Anaheim's income the rental income attributable to Anaheim's percentage interest in the co-tenancy lands and allowed a deduction to Anaheim of a proportion of the expenditures made by SAVI in connection with such lands.

In determining the deficiencies against Anaheim and SARD for 1954, Respond-

ent deducted from the expenses reported by SARD the expenses he deemed attributable to Anaheim's and SAVI's interest in the co-tenancy lands and allocated to Anaheim its proportionate share of these expenses, calculated on the basis of its proportionate record ownership of the co-tenancy lands. After thus allocating the income and expenses of the co-tenancy lands, Respondent calculated SARD's "water costs" [3] for each of the years 1952, 1953, and 1954; and since such "water costs" exceeded the amount SARD had reported in its return as recovered from its stockholders, Respondent found a deficiency against SARD on the basis that its income should be increased by the excess of the "water costs" over what Respondent designated "water sales", i. e., what SARD had reported as recovered from its stockholders. In the deficiency notice, it was stated that SARD's shareholders had "agreed to pay for the costs of the water" and that Respondent had determined that SARD had additional income from "water sales" in 1952 and 1953 and a loss in 1954.

The larger part by far of the deficiencies asserted against Anaheim in each of the pertinent years derives from Respondent's disallowance of portions of the expenditures made by Anaheim in furnishing and delivering water to its

3. This was done by Respondent's determining SARD's "Water costs and other expenses" and then deducting therefrom $6,000.00 denominated "Other expenses (approximation)".

258

shareholders. The disallowance was limited to the amounts by which such expenditures exceeded Anaheim's receipts from the stockholders who purchased the water and it was bottomed on Respondent's determination that, to the extent of such excess over receipts from stockholders, the expenditures were not ordinary or necessary expenses. The controlling opinion in the Tax Court upheld the disallowance on the same basis. 35 T.C. 1076. We cannot agree.

The statutes pertinent here, § 23(a) (1) (A), I.R.C., 1939; § 162(a), I.R.C., 1954, allow deductions for "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". It is not disputed that Anaheim during 1952–54 was carrying on a business—the furnishing and delivery of water to those of its shareholders who desired to purchase water. It is not claimed here that Anaheim's expenditures were not of the kind usually made by companies engaged in the furnishing and delivery of irrigation water in the area in which Anaheim operates, nor is it claimed that Anaheim's business could have been carried on without making the expenditures. There is no contention here that the expenditures were unreasonable in amount. Consequently, it would seem that the expenditures were ordinary and necessary and, hence, deductible.

■ Respondent asserts, however, that ordinarily when a business makes expenditures for the production of a product, it is intended that the business will recover the whole amount of the expenditures in the sale of the product; and accordingly, expenditures made for the production of a product when it is not intended that they will be recouped out of product sales is not an ordinary expense of the business. On this basis, Respondent argues, Anaheim's expenditures in furnishing and delivering water to its shareholders are not ordinary to the extent that they were not recouped from water payments made by the shareholders. This argument would be per-

suasive in the case of a taxpayer carrying on business for profit, and perhaps even in other cases. But Anaheim's expenditures must be determined ordinary or not on the basis of what is ordinary for businesses of the nature and scope of Anaheim's. Deputy v. Du Pont, 308 U.S. 488, 495, 60 S.Ct. 363, 84 L.Ed. 416 (1940). Anaheim's articles of incorporation and by-laws, supra, p. 255, require that it furnish and deliver water to those of its shareholders who desire to purchase water, at net cost, that is, cost after the application to its expenses of all incidental income it derives in its operations. This requirement results from the provisions of Anaheim's articles of incorporation that it will supply water at cost *and* without profit, and from the by-laws' provisions that *all of Anaheim's income shall be used to accomplish the furnishing of water to shareholders without profit.*

■ In the light of these features of Anaheim's business and operations, we must reject Respondent's argument and we hold that all of Anaheim's expenditures in furnishing and delivering water to its shareholders were ordinary and necessary. Indeed, were we to accept Respondent's position we would have to hold that Anaheim's expenditures in the furnishing and delivery of water could not be ordinary and necessary expenses unless Anaheim's directors operated its business contrary to the provisions of its articles of incorporation, that is, unless its business was operated "at a profit". Action by the directors fixing the price of water at a figure which would return all water costs, as Respondent insists they must do in order to render ordinary and necessary Anaheim's expenditures in furnishing and delivering the water to shareholders, would necessarily have the result that Anaheim's incidental revenue would be accumulated as profits.

A number of authorities cited in the controlling opinion below, and some additional cases, are urged upon us by Respondent as supporting the disallowance of the excess of water costs over water

payments. We find none of them actually in point here.

Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933) dealt with whether a taxpayer's payments to creditors of a bankrupt firm with which he was formerly connected, made in order to strengthen his own business standing, were current expenses or capital investment. Interstate Transit Lines v. Commissioner of Internal Revenue, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943) denied a parent corporation a deduction for its payment of the operating deficit of its subsidiary, the business for which the payment was made being not the taxpayer's business. Similarly, in Podems v. Commissioner of Internal Revenue, 24 T.C. 21 (1955) an employee's claimed automobile expenses were held not deductible because they were not incurred in his business but in the business of his employer, from whom he was entitled to reimbursement.

In International Trading Co. v. Commissioner of Internal Revenue, 275 F.2d 578 (7 Cir., 1960) there were held not deductible expenditures in connection with property not used in the trade or business of the taxpayer nor held for the production of income. Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932) involved the question of whether payments received by the taxpayer under an oil and gas lease were entitled to be treated as capital gains. In Fontana Power Co. v. Commissioner of Internal Revenue, 127 F.2d 193 (9 Cir., 1942) the court did not determine whether the expenditure claimed by the taxpayer to be deductible was in fact an expense but stated that, if it were an expense, there was no evidence in the record to show it was "ordinary".

In Glendinning, McLeish & Co. v. Commissioner of Internal Revenue, 24 B.T.A. 518 (1931), aff'd. 61 F.2d 950 (2 Cir., 1932) the expenditures which the taxpayer claimed unsuccessfully to be deductible were held not to be expenses but advances made on the credit of the payee, upon its agreement to reimburse

the taxpayer, and, as advances, not deductible.

Also, Respondent has called to our attention Chicago and Western Indiana Railroad Co. v. Commissioner of Internal Revenue, 303 F.2d 796 (7 Cir., 1962), vacated November 14, 1962, 310 F.2d 380, wherein there is expressed approval of the holding in the controlling opinion below disallowing Anaheim's expenditures as not "ordinary and necessary" business expenses. For the reasons stated hereinbefore, we do not join in such approval.

It is Respondent's position that even if the Tax Court be deemed wrong in holding Anaheim's expenses not deductible as ordinary and necessary to the extent they exceed the amounts received for water furnished, nevertheless the same result must be reached upon either of the alternative theories expressed in two concurring opinions below.

The first concurring opinion, on the basis of its interpretation of Anaheim's by-laws, concluded that the stockholders of Anaheim were obligated to pay the cost of furnishing and delivering the water. Consequently, it reasoned that when Anaheim's rental and royalty income was applied to pay the cost of furnishing and delivering the water, this discharged the stockholders' obligation to pay such water costs. Thus it follows, the opinion reasoned further, that gross receipts from water sales were increased to the extent that Anaheim's rent and royalty income were so applied; and with water receipts balancing the expenditures for water production, the rent and royalty income remained intact as net taxable income.

There are two difficulties with reaching this result. In the first place, the by-laws do not obligate the stockholders to pay the cost of the water. No stockholder is obligated to buy water if he does not choose to do so and, in fact, a substantial amount of shareholders did not do so in the years involved here. Further, as we have pointed out earlier, even those shareholders who do purchase wa-

ter have no obligation to pay more than net cost therefor. The rates set by the directors are what the shareholder water purchasers obligate themselves to pay, and these rates may not be such as will result in a profit to Anaheim, taking into account all of its operations. Accordingly, the use of the rental and royalty income to pay Anaheim's expenses did not discharge obligations owing by stockholders to Anaheim, and the basis for the first concurring opinion falls.

The second concurring opinion below disagreed with the holding of the majority that Anaheim's expenses in excess of its income received from shareholders were not ordinary and necessary. However, it found that Anaheim had net income which it distributed to its shareholders in the form of water for an amount less than the water's value. The opinion assumed the value of the water to be the cost of bringing it to the point where it was delivered to the shareholders, and found the amount of the net income to be the amount by which the value of the water exceeded the amounts paid for the water by shareholders.

It is evident, of course, that the soundness of this opinion is dependent upon the assumption that the cost of the water was its fair market value. Unless the fair market value of the water exceeded the price which the shareholders paid, the shareholders received nothing more than what they paid for and there was no distribution of income or property. In the court below, Respondent offered no evidence concerning the fair market value of the water. On the other hand, Anaheim had testimony of a competent witness that the charge made by Anaheim for its water was its fair market value; and the witness testified, further, that if the rate had been raised substantially, the result would have been that he and other water users would have sought water from sources other than Anaheim. In addition, Anaheim produced evidence that SAVI, the water company most comparable to Anaheim, during the years in question charged its

shareholders less for water than did Anaheim. The testimony as to the fair market value of the water being uncontradicted and unimpeached, it was not permissible to assume a value at variance with the testimony. Loesch & Green Construction Co. v. Commissioner of Internal Revenue, 211 F.2d 210 (Cir. 6, 1954); Robinson Truck Lines v. Commissioner of Internal Revenue, 183 F.2d 739 (Cir. 5, 1950). There being no support for the water value assumed in the second concurring opinion, the finding of a distribution of income to Anaheim's shareholders is also unsupported.

The controlling opinion in the Tax Court found SARD's case indistinguishable from Anaheim's insofar as SARD's claimed deductions for water expenses were concerned and held that such part of the expenses as was paid by rentals received by SARD from lands of record in its name must be disallowed. It is not questioned that SARD's expenditures were the kind that would be made by any taxpayer in the business of increasing river flow, or that such expenditures were necessary to accomplish the work SARD performed, or that they were reasonable in amount. The disallowance was on the basis that so much of SARD's water service expenditures as were paid, pursuant to the provisions of the January 1944 agreement with Anaheim and SAVI, by rents received from lands of record in SARD's name were not "ordinary and necessary". This conclusion, we feel, fails to take into account the realities of the situation.

SARD was formed by Anaheim and SAVI to protect the water rights of the latter and to have SARD do work upstream to increase the flow of water to Anaheim and SAVI. When formed, and at all times pertinent here, there was no intention that SARD should operate at a profit, but only that whatever expenses it incurred in accomplishing the work it was designed to do for Anaheim and SAVI would be paid equally by Anaheim and SAVI. Lands were conveyed to SARD in order to enable it to carry out the purpose for which it was formed,

but SARD had no investment therein. All of the investment in the land was made by Anaheim and SAVI. By contract Anaheim and SAVI, in effect, reserved to themselves the benefits of any income which might be derived from the lands, and SARD took title and possession with the obligation of applying to its expenses in doing the work it had been created to do, any income coming into its hands from the lands. In the circumstances, there was nothing extraordinary in SARD's making or carrying out this obligation, and we hold that SARD's entire expenditures for water services were ordinary and necessary, notwithstanding they were recouped through the application of rentals received by SARD from the lands of record in its name, plus direct payments from Anaheim and SAVI.

 As stated earlier herein, Respondent added to Anaheim's income for the years 1952 and 1953 the rental income attributed to its interest in the lands held in co-tenancy by SARD, SAVI, and Anaheim, and allowed Anaheim a deduction for its proportionate share of rental expenses for those years. For 1954, Respondent allocated to Anaheim a proportionate share of the rental expenses of the co-tenancy lands. Anaheim contests this allocation of income and expenses on the claim that SARD was merely an agent for Anaheim and SAVI and, therefore, had no income or expenses. The court below found an allocation of income and expenses among the co-tenants proper on the authority of National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949); and finding nothing in the record to impeach the reasonableness of the allocation by Respondent, it was approved. We affirm that holding.

The action of the Tax Court approving disallowance of portions of the expenditures made by Anaheim and SARD for water costs or water services is reversed. The action of the Tax Court approving allocation of the income and expenses of the co-tenancy lands is affirmed