FARM SERVICE COOPERATIVE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2067–74.    Filed May 2, 1978.

---

*Jerry T. Light* and *Lewis H. Mathis*, for the petitioner.
*Daniel A. Taylor, Jr.*, for the respondent.

WILES, *Judge:* Respondent determined the following deficiencies in petitioner's income taxes:

| TYE June 30— | Deficiency | TYE June 30— | Deficiency |
|---|---|---|---|
| 1965 | $50.47 | 1969 | $12,726.02 |
| 1966 | 1,185.00 | 1970 | 44,601.07 |
| 1967 | 839.00 | 1971 | 79,010.26 |
| 1968 | 5,413.66 | 1972 | 26,492.40 |

The issues remaining for our consideration are whether a patronage activity in a cooperative subject to the provisions of subchapter T (secs. 1381–1388)[1] can incur a net operating loss. If so, we must determine whether the loss may offset income from nonpatronage activities, and whether the loss may be carried back to earlier tax years.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

During the years in question, Farm Service Cooperative was an agricultural cooperative, organized under the laws of Arkansas, with its principal place of business in Fayetteville,

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.

Ark. Petitioner timely filed its Federal corporate income tax returns, Form 1120, for the years in question with either the District Director of Internal Revenue in Little Rock, Ark., or with the Internal Revenue Service Center in Austin, Tex. Petitioner has been recognized by the Internal Revenue Service as a cooperative and may determine its taxes under subchapter T, sections 1381 through 1388. Farm Service is not, however, an exempt cooperative under section 521.

Petitioner was initially incorporated in 1941 for the purposes of "promoting, fostering, and encouraging the intelligent and orderly marketing of Agricultural products cooperatively, and the growing, breeding, hatching, and marketing of poultry and livestock cooperatively." Since its organization petitioner has changed its name several times, and has amended its articles of incorporation and bylaws. The most recent name change occurred in 1962, the most recent amendment in its bylaws occurred in 1963.

During the years in question, petitioner divided its business activities into four categories: the broiler pool, the turkey pool, the regular pool, and taxable activity.

The broiler pool consisted of hatching, growing, and marketing chickens. Petitioner owned hatcheries where eggs were hatched and baby chicks were raised until 24 hours old. In order to grow the chicks after their first 24 hours, petitioner contracted with local farmers or growers who were responsible for the chicks during their growth cycle. These growers furnished housing, fuel, equipment, and service necessary to grow the birds to their marketing age. Before Farm Service would enter into a contract with a grower, a Farm Service representative would inspect the grower's facilities and generally become acquainted with the grower to assure Farm Service that the grower was willing to comply with rules and regulations established by Farm Service concerning feeding times, supervision, heating, etc. Once the grower was approved and his facilities were ready to accept delivery of chicks, Farm Service delivered chicks from its hatcheries to the growers. After approximately 8 weeks, Farm Service returned and picked up the grown chickens, weighed them, put them in crates, and delivered them to Farm Service's processing plant.

The grower was paid by petitioner for growing chickens based on the delivery weight to the processing plant, less the weight of

chickens condemned by the U.S. Department of Agriculture. The formula under which the grower was paid also took into account variable market rates for full grown chickens, and an efficiency factor that related the number of pounds of feed to the pounds of chickens produced. The efficiency factor was figured into the grower's compensation because Farm Service supplied all chicken feed. Under the contract provisions established with each of the growers, there was also a guaranteed minimum amount the grower would receive from the cooperative irrespective of wholesale market variations. For example, the contract in effect on July 1, 1968, provided that "In no event will the Grower Member receive less than 1.25 cents per pound less U.S.D.A. condemnation." On its books, petitioner treated payments to its growers as a cost of production.

In addition to providing chicken feed, petitioner provided medical care, transportation, and regular supervision during the growth cycle. Petitioner also owned the hatchery and the processing plant where the grown chickens were delivered. All financing of Farm Service's activities went through a cooperative bank, which secured its loans with Farm Service's assets, including Farm Service's title to the chickens.

The second activity Farm Service engaged in was the turkey pool which produced turkeys for market.

The third pool activity, the regular pool, was a supply activity. Farm Service owned four farm supply stores and sold supplies to cooperative members and nonmembers.

Finally, a fourth source of income was Farm Service's taxable activity. This category represents miscellaneous sources of income, including gains from the sale of Farm Service's property, dividends on stock owned by Farm Service, and incidental income such as the cancellation of outstanding checks that had not been cashed, etc.

All growers in the broiler and turkey pools are members of the cooperative. Membership in the cooperative, however, does not necessarily mean participation in more than one pool activity. In contrast to the broiler and turkey pools, not all individuals who purchased farm supplies from the regular pool were members of the cooperative.

Membership in the cooperative is limited to individuals who produce agricultural products, who agree to comply with the cooperative's bylaws, fill out the appropriate application forms,

and purchase one share of stock. Each shareholder is entitled to one vote.

Growing and producing chickens is a highly volatile and frequently risky economic activity. As a result, members of the broiler pool in some years earned reasonable profits, but in other years sustained significant losses. Because of the volatile profits from the broiler pool, members of the regular pool became tired of "carrying the chicken business" and resolved in 1960 that profits and losses of the different activities would no longer be combined for accounting purposes. Section 3, article 10 of Farm Services's amended bylaws, which deals with audits in determining patronage dividends or refunds states in part:

In determining the net savings of this cooperative on business done with its member patrons and with its nonmember producer patrons and the net taxable income of this cooperative on nonmember nonproducer business and the net results of each business activity of this cooperative, all direct costs and expenses shall be borne by the activity in question and all general overhead costs and expenses, including salaries, wages, licenses, interest, dividends on preferred stock, depreciation, repairs, reserves for bad debts, insurance, taxes and all other general operating costs and expenses, shall be equitably borne by the various activities of the cooperative in accordance with accepted accounting procedures and practices. *If a loss occurs in any activity, it shall be borne, insofar as practicable, on an equitable basis by each activity that operated in the black. Any loss that is not wiped out in this way shall be borne by the general reserves heretofore accumulated. In computing its income taxes and for all accounting purposes this cooperative may use carrybacks and carryforwards as provided by law.* [Emphasis added.]

Section 4 of article 10, which describes how the cooperative savings are to be paid out, states in part:

All net savings on business done by this cooperative with its member patrons and with its nonmember producer patrons cooperative is obligated to allocate and pay to them on a patronage basis relative to their quantity or value of business done with each such patron. [sic]

Petitioner maintained separate books and records for each of the three pools and for the taxable activity. The results of these accounts were combined, however, on petitioner's Federal income tax form. When income could properly be distributed from the pools in the form of patronage dividends, petitioner distributed or allocated income to the pool members based on their activity within the pool.

For the fiscal year ended June 30, 1971, petitioner distributed or allocated to its turkey pool members the net patronage

income derived from the turkey pool activities, and distributed or allocated to its regular pool members the net patronage income derived from the sale of farm supplies to its regular pool members. For the fiscal year ended June 30, 1971, the source of income and distributions from the turkey and regular pools were as follows:

Patronage income from turkey pool.......$4,088.80

Income from regular pool:
  Members.........................................51,510.37
  Nonmembers....................................20,528.75
   Total....................................................... $76,127.92

Less: Patronage dividends paid to:
  Turkey pool members.......................... 4,088.80
  Regular pool members.......................51,510.37
   Total.......................................................55,599.17

Balance: Income from regular pool attributable
   to nonmember business....................................20,528.75

During the same period, broiler pool expenditures exceeded broiler pool gross receipts by $572,634.37, and income from taxable activities was $156,497.56.

Petitioner on its income tax return filed for the period ended June 30, 1971, offset the regular pool income of $20,528.75 attributable to nonmember business with its losses from the broiler pool, thereby reducing the broiler pool deficit to $552,105.62. Petitioner further reduced the broiler pool deficit to $395,608.06 by offsetting $156,497.56 of income from the taxable activity.

Petitioner timely filed Form 1139 requesting refunds for the carryback of $165,469.67 of the remaining broiler pool deficit, thereby reducing the broiler pool deficit to $230,138.39. The amount of the loss carryback to the 3 preceding years was as follows:

| *FYE June 30—* | *Amount of loss carryback* |
|---|---|
| 1968 | $24,257.28 |
| 1969 | 39,626.22 |
| 1970 | 101,586.17 |
| Total loss carryback | 165,469.67 |

The loss carryback was charged to an unallocated, general reserve account.

Petitioner also timely filed Form 1139 requesting a carryback of its unused investment credit for the fiscal years ended June 30, 1970, 1969, and 1968. The effect of carrying back its unused investment credit from these years was to request refunds for the fiscal years ended June 30, 1967, 1966, and 1965. These refunds were credited to petitioner's unallocated, general reserve account.

Petitioner allocated the remaining $230,138.39 of the broiler pool deficit to its broiler pool reserve account thereby reducing its broiler pool reserves from $448,744 to $218,605.61.

For the fiscal year ended June 30, 1972, the broiler pool's expenditures exceed broiler pool receipts by $72,040.65. The entire amount of this broiler pool deficit was used to offset nonmember income from the regular pool and taxable activity income earned during the fiscal year ended June 30, 1972.

In his notice of deficiency issued to petitioner, respondent disagreed with the method petitioner used in offsetting cooperative income with the broiler pool deficit. In pertinent part, the notice of deficiency states,

Deductions of $572,634.37 and $72,040.65 claimed for broiler pool losses on your returns for June 30, 1971 and June 30, 1972 are not allowable offsets to current taxable income but are charges against the broiler pool reserve.

\* \* \* \* \* \* \*

As a result of the above adjustments to your return for June 30, 1971, the net operating loss for that year which was carried back to taxable years June 30, 1968, June 30, 1969 and June 30, 1970 and tentatively allowed is eliminated.

Further, since the net operating loss is eliminated, the carryback of unused investment credits to June 30, 1965 and June 30, 1966 from June 30, 1968 and to June 30, 1967 from June 30, 1970 and tentatively allowed are also eliminated.

## OPINION

Petitioner is a cooperative that determines its Federal income tax under the provisions of subchapter T. We must determine whether one of petitioner's patronage activities can incur a net

operating loss. If so, we must determine whether the loss may offset income from nonpatronage activities, and whether the loss may be carried back to earlier tax years.

In 1971 and 1972, petitioner's broiler pool was unsuccessfully operated; expenditures exceeded income by $572,634.37 and $72,040.65, respectively. Petitioner, after first distributing or crediting patronage dividends to its turkey pool and regular pool members, offset regular pool income derived from nonmember business with the broiler pool loss, offset miscellaneous income from its taxable activity with the broiler pool loss, carried back the broiler pool loss, and reduced the cooperative's taxable income for the 3 preceding years to zero, and finally, allocated the remaining broiler pool loss to the broiler pool reserve account, reducing the broiler pool reserves.

Respondent contends petitioner's treatment was improper for the following reasons: First, since petitioner is a cooperative, and the broiler pool is a patronage activity, income from the broiler pool may be distributed in the form of patronage dividends to cooperative members. If properly distributed or credited, income from patronage activities is not taxed to the cooperative. Consequently, respondent contends, since cooperatives may reduce their taxable income from patronage activities to zero, cooperatives operate their patronage activities without a profit motive. Lacking a profit motive, deductions are not allowed under section 162, and without deductions under section 162, it is not possible for patronage activities to incur net operating losses under section 172. Second, respondent argues that petitioner must offset broiler pool losses by reducing the broiler pool reserves account, an account respondent contends was established precisely for loss years. Finally, respondent, by an argument raised in his amended answer, contends that section 277 prohibits any current deduction of the broiler pool deficits during the years before us because petitioner's activites were not profit motivated. As respondent raised this final argument in his amended answer, he has the burden of proof on this question. Rule 142(a), Tax Court Rules of Practice and Procedure.

Petitioner, in contrast, contends the broiler pool was a business activity for which the cooperative had a profit motive, and for which the cooperative bore all risk of loss. Consequently, the cooperative is entitled to deductions under section 162 and

section 172 as a result of losses arising from the broiler pool activity. Further, petitioner contends that section 277 does not apply to the facts before us since section 277 was designed to prevent cooperatives from intentionally generating patronage losses in order to offset nonpatronage income.

The initial point of disagreement between the parties is whether cooperatives may incur net operating losses from their patronage activities. Respondent views a cooperative as a sort of conduit that can distribute patronage profits to its patrons and thereby avoid paying tax on the profits. To a limited extent, respondent is correct that a cooperative may distribute or, under limited circumstances, credit or allocate patronage income to cooperative members, and in so doing reduce gross income. Sec. 1382. From this observation, respondent carries the conduit approach beyond the statutory framework and concludes that in a loss year—in a year when patronage expenses exceed patronage income—the only proper recourse is for the cooperative to obtain capital contributions or refunds from cooperative members, thereby running the cooperative on a "cost" principle. Running a patronage activity on a cost principle prevents it from being profit motivated and therefore incapable of obtaining deductions under section 162 and section 172. We must disagree with respondent's scheme of things.

Recently, in *Associated Milk Producers, Inc. v. Commissioner*, 68 T.C. 729 (1977), we considered respondent's contention that a cooperative, which determined its Federal income tax under subchapter T, was prohibited from incurring net operating loss deductions. In that case the cooperative's only activity was a patronage activity which suffered substantial losses in 1959 and 1960. The cooperative used the losses to offset income in profitable years. The Commissioner argued, as he does here, that section 172 does not apply to cooperatives, since cooperatives were to be operated on a cost principle. He further contended that cooperatives, operating on a cost principle, must recoup losses from member patrons. After considering the Commissioner's arguments, we rejected them and concluded that there was nothing in the language of section 172 denying cooperatives the right to net operating loss carryover deductions. We further rejected Commissioner's "cost" principle analysis of cooperatives that would have required the recoupment of patronage losses from cooperative members.

We find no reason or argument in the case before us which would lead us to modify our decision in *Associated Milk Producers*. Consequently, we conclude that cooperatives are entitled to net operating loss deductions resulting from patronage activities. Implicit in this conclusion, as it was in *Associated Milk Producers*, is the conclusion that patronage activities are carried on for a profit, hence ordinary and necessary expenditures, unless otherwise disallowed, are deductible by the cooperative under section 162.[3]

Respondent's next contention is that broiler pool losses should only offset broiler pool reserves. Respondent's theory underlying this argument is that netting broiler pool losses against broiler pool reserves has the effect of requiring broiler pool members to make up their own losses. To the extent broiler pool losses exceed the reserve account, respondent believes petitioner should request contributions from its broiler pool members. The overall effect of respondent's scheme is to give symmetry to his "operation-at-cost" theory of a cooperative.

Petitioner, of course, contends it is not required to offset broiler pool losses only with the broiler pool reserve account. Rather, petitioner contends that board action by the cooperative,

---

[3] Although *Associated Milk Producers* did not specifically discuss whether patronage activities were carried on for profit, it implicitly passed on the question when it concluded that the cooperative was entitled to net operating loss deductions that occurred because expenses exceeded income. There are, however, very significant reasons why petitioner has a profit motive. First, respondent's contention that cooperatives lack a profit motive for patronage activities is based on the deduction for patronage dividends, granted by sec. 1382. This deduction, if properly obtained, allows cooperatives to reduce their taxable income from patronage activities to zero, hence respondent argues, no profit motive. Simply stated, respondent argues that Congress intended to penalize cooperatives by taking away sec. 162 deductions when it enacted *relief* provisions encompassed in sec. 1382. Not only is this reasoning questionable, but respondent has cited us no legislative history supporting his position. Secondly, respondent fails to explain language in sec. 1.1382–2(a), Income Tax Regs., stating that deductions under sec. 1382 are "in addition to other deductions allowable under chapter 1." Respondent would like us to add a corollary to this language stating that sec. 1382 was also *in place of* sec. 162 deductions. Again, respondent cites no authority for his interpretation. Thirdly, as support for his contention that cooperatives have no profit motive for their patronage activities, respondent relies upon a line of cases in which cooperatives were established with the *intent* of generating consistent losses from membership activities. See, e.g., *Anaheim Union Water Co. v. Commissioner*, 35 T.C. 1072 (1961), revd. in part 321 F.2d 253 (9th Cir. 1963); *Adirondack League Club v. Commissioner*, 55 T.C. 796 (1971), affd. 458 F.2d 506 (2d Cir. 1972). These cases are distinguishable: the broiler pool was intended to be profitable, and considering its substantial reserve for losses, had been profitable in prior years. It was not a sham established primarily to shelter nonpatronage income. Finally, respondent has been inconsistent: he argues the broiler pool had no profit motive and therefore petitioner should be denied all sec. 162 deductions arising therefrom. Yet respondent has allowed the regular pool, a profitable activity for both member patrons and nonmember patrons, to deduct *all* expenses under sec. 162. Following respondent's logic, only those expenses relating to profits from nonmembers should be deductible under sec. 162. Respondent, however, does not contend such an allocation should be made.

its articles of incorporation, and bylaws clearly authorize and "equitable apportionment of losses" among cooperative members. In this argument, petitioner relies on section 3, article 10 of Farm Service's amended bylaws which states in part:

If a loss occurs in any activity, it shall be borne, insofar as practicable, on an equitable basis by each activity that operated in the black. Any loss that is not wiped out in this way shall be borne by the general reserves heretofore accumulated.

The problem with respondent's scheme of things was pointed out in *Associated Milk Producers, Inc. v. Commissioner, supra* at 738–739, where he made a similar argument that current losses should be charged to reserves existing at the end of the loss year. In response to this argument we noted that if "losses are charged to capital reserves existing at the end of the loss year, the burden of loss might be allocable to the specific patrons of the loss year, *but only to the extent that such patrons had capital reserve accounts from prior years' patronage.*" (Emphasis added.) Therefore, instead of requiring a mechanical netting of losses against reserves as suggested by respondent, we relied upon the cooperative's bylaws and articles of incorporation which provided that losses shall be borne by the patrons "on a basis deemed equitable by the board of directors." In sum, we allowed the board of directors discretion to determine the best ways of allocating losses among cooperative members. Similarly, we conclude that petitioner's board of directors may, under the provisions of section 3, article 10 of its amended bylaws, determine the most equitable and appropriate method of allocating the broiler pool losses. Consequently, we conclude it is not improper for the cooperative to offset broiler pool losses with income from the cooperative's profitable activities, or to offset broiler pool losses with general, unallocated reserves.[4]

Respondent's final contention is that section 277[5] prevents

---

[4]In reaching this conclusion we specifically find that the broiler pool was not an activity consistently and intentionally operated at a loss with an intent to shelter income from nonmembership sources.

[5]SEC. 277. DEDUCTIONS INCURRED BY CERTAIN MEMBERSHIP ORGANIZATIONS IN TRANSACTIONS WITH MEMBERS.

(a) GENERAL RULES.—In the case of a social club or other membership organization which is operated primarily to furnish services or goods to members and which is not exempt from taxation, deductions for the taxable year attributable to furnishing services, insurance, goods, or other items of value to members shall be allowed only to the extent of income derived during such year from members or transactions with members (including income derived during such year from institutes and trade shows which are primarily for the education of members). If for any taxable year such

petitioner from taking any current deduction for its broiler pool losses. This contention was originally raised by respondent in an amended answer, and as such, respondent has the burden of proof on this issue. Rule 142(a), Tax Court Rules of Practice and Procedure.

Although respondent has the burden of proof on the question of whether section 277 applies to the facts before us, he has cited no legislative history and has referred us to no cases that support his contention. In fact, respondent's entire argument on this point in both his original and reply briefs consists of less than three pages, most of which merely paraphrases section 277. Without the benefit of a well-supported legal argument we must determine whether respondent has met his burden of proof on this issue.

The legislative history underlying section 277 indicates that it was enacted for a fairly specific purpose. S. Rept. 91–552 (1969), 1969–3 C.B. 423, 471, states:

The purpose [of section 277] is to prevent membership organizations from escaping tax on business or investment income by using this income to serve its members at less than cost and then deducting the book "loss."

As an example of the type of organization at which section 277 is directed the Senate report, in an obvious reference to *Anaheim Union Water Co. v. Commissioner*, 321 F.2d 253 (9th Cir. 1963), revg. in part 35 T.C. 1072 (1961), notes that, "In an important decision, it was held that a non-exempt water company was not subject to tax when the 'losses' in supplying its members water offset its investment income." From the legislative history therefore, it appears that Congress enacted section 277 to attack sham losses, those losses that were constantly and intentionally generated in dealings with members so that the profits from commercial ventures—such as investment activities—could be passed on to such members free of tax. See, e.g., *Anaheim Union Water Co. v. Commissioner*, *supra*. In the case before us, however, it is apparent that the broiler pool was not constantly and intentionally operated at less than cost in order to generate losses: in several years prior to

---

deductions exceed such income, the excess shall be treated as a deduction attributable to furnishing services, insurance, goods, or other items of value to members paid or incurred in the succeeding taxable year.

those before us, the parties recognize that the broiler pool had been profitable.

Finally, and in passing, we note that no cases referring to section 277 have facts similar to those before us. See *Five Lakes Outing Club v. United States,* 468 F.2d 443 (8th Cir. 1972) (social club losses may not offset rental income; recreational activities of social club were not entered into with a profit motive); *Associated Barbers & Beauticians v. Commissioner,* 69 T.C. 53 (1977) (taxpayer operated primarily to supply members with life insurance, loss of income insurance, malpractice insurance, hospitalization insurance, credit unions, eye glasses, etc.; losses from providing these services to members were not available to offset interest income, investment income, and magazine subscription income); *Adirondack League Club v. Commissioner,* 55 T.C. 796 (1971) (losses in operating a hunting and fishing preserve and pleasure resort for club members not available to offset income from cutting and selling timber).[6]

Since neither the legislative history nor the case law under section 277 supports respondent's contention, we must conclude that respondent has failed to meet his burden of proof on this issue.

In sum, we conclude that, based on the facts presented, and based on the arguments before us, petitioner's broiler pool operated with a profit motive, and as such petitioner may deduct expenses in excess of income. We also conclude that these broiler pool losses are not restricted to merely offsetting broiler pool reserves, but may offset income from petitioner's profitable activities as well as petitioner's general reserve. Further, any net operating loss created thereby may be deducted under the provisions of section 172. Finally, we conclude respondent has failed to meet his burden of proof in arguing that section 277 should apply to the facts before us.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[6] *Boating Trade Ass'n of Metropolitan Houston v. United States* (S.D. Tex. 1975, 35 AFTR 2d 75–1228, 75–1 USTC par. 9398); and *Shore Drive Apartments, Inc. v. United States* (M.D.Fla. 1976, 38 AFTR 2d 76–5916, 76–2 USTC par. 9808), refer to sec. 277, but do not indicate what membership services were involved.