ADIRONDACK LEAGUE CLUB, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4752–67.   Filed February 25, 1971.

*Hugh R. Jones*, for the petitioner.
*Stephen M. Miller*, for the respondent.

WITHEY, *Judge:* Respondent determined deficiencies in petitioner's Federal corporate income taxes as follows:

| Year | Amount |
|------|--------|
| 1962 | $7,887.87 |
| 1963 | 11,898.62 |
| 1964 | 12,965.94 |
| 1965 | 9,819.25 |

The only issue for decision is whether petitioner is entitled to deduct certain expenses as ordinary and necessary business expenses under section 162(a), I. R. C. 1954.[1]

### FINDINGS OF FACT

Petitioner Adirondack League Club is a nonprofit New York corporation whose income tax returns were filed with the district director of internal revenue, Syracuse, N.Y., for the taxable year 1962, and with the district director of internal revenue, Buffalo, N.Y., for the taxable years 1963, 1964, and 1965.

Adirondack was formed on June 21, 1890, for the following stated purposes:

(1) The preservation and conservation of the Adirondack forests and the proper protection of game and fish in the Adirondack Region. (2) The establishment and promotion of an improved system of forestry. (3) The maintenance of an ample preserve for the benefit of its members for the purpose of hunting, fishing, rest and recreation.

These purposes have, in all respects material herein, remained substantially the same through the years in issue. Petitioner owns approximately 50,000 acres of land located in the Adirondack Forest Preserve in Herkimer and Hamilton Counties in New York State, such property consisting of wild forest lands, lakes and streams, swamp lands, and portions of the Moose River. In addition, petitioner leases additional adjacent land to provide more land upon which its members may hunt, fish, and pursue other recreational activities. Title to all of its real property was acquired by petitioner prior to 1913, except for a small parcel acquired in 1964 in order to protect a certain lake from poachers and to incorporate an outlying camp into its territory. This latter parcel has been used exclusively for hunting, fishing, and other recreational activities.

Adirondack maintains three lodges, one each at Little Moose River, First Bisby Lake, and Honnedega Lake where members or their guests may stay, together with cottages and 10 scattered outlying hunting and fishing camps. The Honnedaga and Bisby Lodges are each staffed by a man and wife, while Little Moose, the largest lodge, is staffed by a man and wife, a cook, two waitresses, a handyman, and occasionally part-time employees. Rooms may be rented at all three lodges throughout the year, but Honnedaga and Bisby lodges serve meals only about 2 months out of the year and Little Moose Lodge serves meals about 7 months per year. The yearly average occupancy rate at Little Moose is approximately 21 percent. Little Moose and Bisby are acces-

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

sible by road but Honnedaga, the most remote, is accessible only by boat.

The club is not open to the general public. One must be either a member or a guest thereof in order to be entitled to use any of the club's facilities. Membership in petitioner is limited to natural persons and is divided into three classes, regular members, associate members, and honorary members. Regular members paid annual membership dues in each of the years in question of either $300 or $400 and associate members, depending on their ages, paid annual dues of from $50 to $450. In addition to the payment of dues, members are charged for facilities made available and services rendered to them and their guests. The following is a list of such charges and other requirements as described in the Club Directory and Rate Schedule, effective as of June 1965:

REGISTRATION

All members, their families and guests upon EACH arrival on the Preserve, must register at the nearest Lodge, as required by law.

RESERVATIONS AND CANCELLATIONS

Reservations for accommodations shall be made in advance.
Cottage reservations must be cancelled at least 15 days before effective, or a 20% charge will be made.

\*      \*      \*      \*      \*      \*      \*

GUESTS

Guest Cards.—Guest cards are required of all guests coming on the Preserve (whether visiting a lodge, a member's camp, or an outlying camp), and must be presented at the registering desk directly upon arrival. No accommodations or services will be furnished until a properly endorsed guest card is presented. Cards will be issued only upon request of a member for his named guest, or by the Club Trustees, and may be obtained from the Secretary or the Chairman of any Management Committee.

Guest Charges.—Charges incurred by guests will be billed to the sponsoring member. Charge tickets covering accommodations and services furnished to guests will be completed by the guest, showing the sponsoring member's name for "charge to" and signing his own name underneath. The following charges shall be paid with respect to guests on the Preserve.

A surcharge of 15% will be added to all bills contracted by guests.
A fee of $30.00 per guest will be charged for the privilege of deer hunting.
A fee of $5.00 per day per guest will be charged for fishing privileges from April 15 to June 30, and from the Tuesday following Labor Day to September 30, all dates inclusive.

FISHING AND HUNTING

New York fishing and hunting licenses are required on the Preserve. Women are required to possess fishing licenses, but minors under 16 are exempt.

Reports of all fish and game taken are to be submitted to the Club.

As guiding facilities are limited, it is suggested that early arrangements be made through the Lodge managers.

## OUTLYING CAMPS

For overnight use (beginning at 10 a.m.) _____ $10
For day use (except deer season when $10 rate applies) _____ $5

Reservations for camps shall be made in advance, and a charge for such accommodations will be made unless cancelled seven days in advance of anticipated occupancy.

## BOATS

Rental.—Guide boats, canoes_____ $1.50 per day or $7.50 per week
Storage in Club Boathouse.—Canoes,
   rowboats, sailboats, all kinds_____ $1 per month plus labor and cartage

## GARAGE RENTAL

Per car_____ $0.50 nightly, $3 weekly
Honnedaga only.—Auto shed_____ $20 for season

## TRANSPORTATION

Little Moose and Bisby :
   Hand baggage_____ $0.50 each
   Trunks_____ $1.50 each

Parcel Post, Freight & Express :
   Under 1 pound_____ no charge
   Over 1 pound_____ $0.50 per cwt.
                        (minimum $0.50)

Honnedaga.—Due to both truck and boat transportation, the above rates will be doubled at Honnedaga.

## RATES FOR EMPLOYEES

Guides, employees of members or guests, contractors, workmen, etc., eating in employees' dining room :

### MEALS

Breakfast, $0.75    Noon Dinner, $1.25    Supper, $1.00

Lunch to take out, $1.25

LODGING_____. $2.00 per night

### LITTLE MOOSE LODGE

\*     \*     \*     \*     \*     \*     \*

### MEALS

$8.25 per day

Breakfast, $1.75    Luncheon, $2.50    Dinner, $4
Children under eight years of age—$6.50 per day
Breakfast, $1.50    Luncheon $2    Dinner, $3

## LODGING—WITHOUT MEALS

Summer House:
  Single rooms_____ $7 to $17 per day
  Double rooms_____ $12 to $19 per day

Winter House:
  Single rooms_____ $9 to $11 per day
  Double rooms_____ $13 to $15 per day

  Weekly rate_____ $1 per day less than above.

Club Cottages:
  No. 1-2-3—Living room, porch, kitchen, 5 bedrooms, 2 baths, 3 fireplaces. Weekly Maid Service.
  No. 4—Living Room, porch, kitchen-dining room, 4 bedrooms, 2 baths, 3 fireplaces. Weekly Maid Service.
  No. 5—Living room, 2 bedrooms, 1 bath, 1 fireplace. Daily Maid Service.
  No. 6—Living room, porch, kitchenette, 1 bedroom, 1 bath. Weekly Maid Service.

|              | July  | August | September |
|--------------|-------|--------|-----------|
| No. 1-2-3-4  | $625  | $825   | $450      |
| No. 5        | 425   | 550    | 275       |
| No. 6        | 350   | 450    | 200       |

Less than month will be daily rate of one-thirtieth of monthly rate.

(Above Rates Include Tips)

### BISBY LODGE

*     *     *     *     *     *     *

### MEALS

$7.25 per day
Breakfast, $1.50     Luncheon, $2.25     Dinner, $3.50
Club dining room open about July 1 through Labor Day

### LODGING—AMERICAN PLAN ONLY

July 1 through Labor Day

Rooms—with Meals:
  Single Room—$15.00 per day, $100 per week
  Double Room—$26.50 per day, $175 per week
Club Cottage (American plan only):
  Wigwam—Living room with fireplace, porch, 2 bedrooms, bath and kitchenette.
  Sylvan Lodge—Living room, porch, 2 bedrooms and bath.
  The Shack—One room and bath.

|              | July  | August | September |
|--------------|-------|--------|-----------|
| The Shack    | $200  | $250   | $165      |
| Sylvan Lodge | 360   | 440    | 275       |
| The Wigwam   | 410   | 490    | 325       |

To the above cottage schedule, add $7.25 per person per day for meals for those occupying The Shack and Sylvan Lodge. Those occupying the Wigwam may (at their option) take all meals at the Clubhouse, in which event the charges for the cottage and board will be the same as the charges for Sylvan Lodge; or they may take only two meals per day at the Clubhouse, in which event the cottage rent will be as per above schedule plus $5.75 per person per day for meals.

Except as above stated for occupants of the Wigwam, no credit will be allowed any lodger for absence from meals.

A cottage will not be rented for a period of less than one week. If taken by the week, the rent will be 25% of the rates shown in the schedule for the month plus the regular charges for meals.

For children's rates, please see the Lodge Manager.

Spring Rates—Room Only—$6.00 per person per day.

These rates apply until Club dining room opens.

### BISBY ROAD TOLLS

#### To and from Bisby

Passenger Tolls:

| | |
|---|---|
| For one person each way | $0. 50 |
| Maximum per car each way | $1. 00 |
| $15 Single Trip Coupons | $5. 00 |
| Maximum ticket per trip | two |

Truck Tolls.—(To and From Bisby or Woodhull—driver included)

| | Empty | Loaded |
|---|---|---|
| 1 ton capacity | $0. 50 | $0.45 per cwt. of load. |
| 1 to 2 tons capacity | 1. 00 | 0.45 per cwt. of load. |
| Building materials | | $0.20 per cwt. |

### HONNEDAGA LODGE

\*  \*  \*  \*  \*  \*  \*

### MEALS

Restaurant service limited to lunch ($1.50) and dinner ($3.50). Breakfast service not available.

### LODGING

(Prices include the evening meal. Lunch is optional at extra cost ($1.50). No breakfast service available.)

The Annex:

First floor: Living room with fireplace, kitchenette, 4 double bedrooms with twin beds, 2 baths.

Occupancy:

| | Daily | Weekly |
|---|---|---|
| 2 persons, each | $13. 50 | $81 |
| 3 persons, each | 12. 50 | 75 |
| 4 persons, each | 11. 50 | 69 |
| For fifth person, add | 9. 00 | 54 |
| For over 5 persons, add for each | 7. 00 | 42 |

Second floor: Living room, kitchenette, breakfast room, 3 double bedrooms with twin beds, 1 bath.

| Occupancy: | Daily | Weekly |
|---|---|---|
| 2 persons, each | $12.50 | $75 |
| 3 persons, each | 11.50 | 69 |
| 4 persons, each | 10.50 | 63 |
| For 5th person, add | 8.50 | 51 |
| For 6th person, add | 6.50 | 39 |

Cabin No. 1.—For 2 to 6 persons, living room with 2 single day beds and Franklin stove; 2 bedrooms with twin beds; kitchenette, and bath.

| Occupancy: | Daily | Weekly |
|---|---|---|
| 3 persons, each | $12.50 | $75 |
| 4 persons, each | 11.50 | 69 |
| For 5th person, add | 9.00 | 54 |
| For 6th person, add | 7.00 | 42 |

Special rate for 2 persons, minimum 2 weeks, $100.00 per week, each.

Cabin No. 2.—For 2 to 4 persons, living room with 2 single day beds and fireplace; bedroom with twin beds; kitchenette, and bath.

| Occupancy: | Daily | Weekly |
|---|---|---|
| 2 persons each | $14.50 | $87 |
| For 3d person, add | 12.50 | 75 |
| For 4th person, add | 10.50 | 63 |

Special rate for one person, minimum 2 weeks, $120.00 per week.

### HONNEDAGA LAUNCH FARES

During the Clubhouse season, July 1 thru Labor Day, the Club boat will make two scheduled trips per day, one between 9 a.m. and 10 a.m. and one between 4 p.m. and 5:30 p.m.

| | |
|---|---|
| Adults (each) one way | $2.00 |
| Children from 5 to 12 years | 1.00 |
| Children under 5 years of age | free |
| Guides, employees or workmen (each) | 0.50 |
| Special or off-season trips (Launch) | 12.50 |
| Special trip-outboard boat (each) | 2.50 |

In addition to petitioner's own facilities, some 90 individual lots within the boundaries of petitioner's property are owned by individual members of petitioner, subject to substantial restrictions on alienability. Those members have constructed houses, cottages, cabins, and shacks thereon for their own use and occupancy, and pay all taxes and maintenance expenses related to these lots.

The club is controlled by a board of trustees headed by a president. There were 14 operating committees at the time of trial, each committee being responsible for the operations of a particular functional area of the club.

The club uses its land for lumbering operations in addition to providing recreational facilities for its members. Approximately 5 per-

cent of Adirondack's land is lumbered each year leaving the remaining 95 percent available for the free use of the members. To assist in the lumber operations and in fulfilling one of its primary objectives, the establishment and promotion of an improved system of scientific forestry, petitioner has hired the services of a series of professionally trained foresters. During the years in issue, petitioner had engaged a firm of professional foresters to review petitioner's then-current forest management plan and to advise as to the progress and effects of the plan, to put the plan into effect, and to recommend modifications thereof. The services rendered by this firm consisted of:

(1) "Cruising" the land area, i.e., examining the forest lands to determine the condition of the forest; petitioner's management forestry plan was then checked in light of the forest condition to determine if the plan was feasible. Recommendations were then made to petitioner's forestry committee, including an opinion on the feasibility of the projected forestry management plan in light of the forest condition and estimated timber income if the plan was implemented. The forestry firm communicated with the club solely through the forestry committee and had no communications with the club regarding the income-producing potential of the forest prior to the design of its plan.

(2) After the forestry committee received the recommendations, they sometimes requested further checks in certain areas or offered certain guidelines; the forestry firm's recommendations were sometimes accepted in full. When a final decision on the plan was made, the timber to be cut was marked. In determining whether to cut a tree or not, a number of criteria were used:

(a) the condition of the tree, whether or not it was healthy, vigorous, mature, whether it had a good form or other potential—its position, whether or not it was well spaced;

(b) its species, i.e., whether or not it was a desirable species or whether it was a species that should be removed as soon as practicable;

(c) whether it was commercially desirable to cut the tree.

(3) After the trees were marked, the foresters prepared a prospectus for the timber and selected the people to whom bids were sent. They further assisted the club in preparing logging contracts with the successful bidders. The logging contracts made by the club imposed limitations not usually found in logging contracts made by entities primarily interested in obtaining the highest financial return on their forest lands:

(a) Trees containing merchantable logs need not be marked if they were within 100 feet of certain bodies of water or trails.

(b) Only marked trees could be cut.

(c) The size of the equipment to be used by the logging companies was restricted to limit the damage to the forest despite the resulting decreased efficiency of the logging operation.

(d) A limitation upon the time of year during which logging may be done to prevent interference with other recreational uses of the land.

The limitations were imposed to limit the effects of the lumber operations upon the club's use of the forest lands consistent with the primary corporate objectives outlined above. The foresters supervise the performance of the logging contracts to assure petitioner the conditions specified therein are carried out.

Starting in 1950, the club has continually employed the services of an expert on fresh water life. His primary duties as consultant are to:

(1) promulgate the fish stocking policy for the club which involves selecting the number, types, and sizes of the fish to be stocked.

(2) suggest physical changes in the environment to increase the fishing potential;

(3) keep the club aware of legislative changes affecting its management program; and

(4) report annually on the club's fish activities.

Also, the consultant on behalf of Cornell University conducts a cooperative research program on the club's property, the purpose of which is to generate knowledge useful in managing fisheries. The club has permitted similar studies to be made on its property concerning management of deer herds. Petitioner spends approximately $4,000 per year in stocking its waters with fish and approximately $2,000 per year on food to maintain the deer herd during the winter.

In 1941, Adirondack was ruled tax exempt under section 101(9) of the Internal Revenue Code of 1939 and corresponding provisions of prior revenue acts. This ruling was predicated upon petitioner's organization and operation as a social club within the intendment of such provisions. By letter ruling dated July 9, 1947, this exemption was revoked and petitioner was held subject to Federal income taxes beginning with the taxable year 1943. The exemption was revoked because in respondent's opinion, since Adirondack received a substantial amount of income from the sale of lumber, it was no longer organized and operated exclusively for pleasure, recreation, or social purposes.

Petitioner's income and expenses for the years in issue were as follows:

## ADIRONDACK LEAGUE CLUB

INCOME AND EXPENSE SUMMARY

For years ended Dec. 31, 1962-65

|  | 1962 | 1963 | 1964 | 1965 |
|---|---|---|---|---|
| **INCOME AND EXPENSES FROM OTHER THAN TIMBER OPERATIONS** | | | | |
| *Income* | | | | |
| Dues | $90,646 | $86,504 | $85,829 | $85,748 |
| Rooms and cottages | 22,615 | 23,923 | 23,099 | 27,625 |
| Sales of food, beverages, and stores | 50,185 | 42,894 | 47,964 | 55,013 |
| Less cost of sales | (29,341) | (28,153) | (35,115) | (38,220) |
| Fish and game fees | 7,918 | 8,885 | 8,505 | 9,227 |
| All other operating income [1] | 15,923 | 14,459 | 14,441 | 16,798 |
| Dividends and interest | 8,540 | 8,643 | 11,696 | 11,249 |
| Gain on sale of securities | 6,401 | 798 | 3,125 | 1,169 |
| Subtotal | 172,887 | 157,953 | 159,544 | 168,609 |
| *Expenses* | | | | |
| Recreational: | | | | |
| Payroll and payroll costs | 95,654 | 93,001 | 93,360 | 109,737 |
| Depreciation | 14,018 | 14,658 | 16,083 | 16,728 |
| All other | 54,442 | 57,640 | 65,083 | 70,082 |
| Total recreational | 164,114 | 165,299 | 174,526 | 196,547 |
| Real estate taxes [2] | 30,893 | 32,313 | 37,500 | 38,413 |
| Total expenses | 195,007 | 197,612 | 212,026 | 234,960 |
| Net income (loss) from other than timber operations | (22,120) | (39,659) | (52,482) | (66,351) |
| **INCOME AND EXPENSES FROM TIMBER OPERATIONS** | | | | |
| *Income* | | | | |
| Timber sales | 66,269 | 67,616 | 77,141 | 65,610 |
| Less depletion | (11,612) | (11,657) | (19,557) | (12,140) |
| Net | 54,657 | 55,959 | 57,584 | 53,470 |
| *Expenses* | | | | |
| Depreciation | 2,505 | 1,157 | | |
| All other | 17,786 | 11,347 | 9,847 | 9,089 |
| Total timber expenses | 20,291 | 12,504 | 9,847 | 9,089 |
| Net income from timber operations | 34,366 | 43,455 | 47,737 | 44,381 |
| Total net income (loss) from all operations | 12,246 | 3,796 | (4,745) | (21,971) |
| Dividends-received credit | 2,117 | 1,908 | 2,297 | 2,636 |
| Taxable income (loss) per return | 10,129 | 1,888 | (7,042) | (24,607) |

[1] This category includes, among other items, transportation charges, rentals from hunting and fishing lodges, guest fees, water and sewage charges, firewood provided for members, income from the sales of lots, and income from the sale of ownership shares in the club.

[2] The club does not allocate the real estate taxes between the timber operations and its other activities.

The items of expenses shown above were not unreasonable in amount in exchange for the goods and services rendered in return therefor. In 1949, in attempt to eliminate the losses incurred on the recreational activities, a 20-percent assessment was levied on all members and a 10-percent surcharge was added to existing club charges. This method proved annoying to many members and was discontinued. Accordingly, petitioner's budgets for the taxable years 1964, 1965, 1966, and 1967 projected profits from the timber operations and losses from the

recreational operations of the club. In its corporate income tax returns for the years in issue, petitioner has offset the losses incurred in the recreational activities against the income generated from the timber operations. In his notice of deficiency, respondent disallowed the deduction of those losses.

OPINION

Section 162 (a) provides a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." The expenses in issue are deductible, if at all, under this section. Both parties have stipulated the disputed expenses are reasonable in amount and respondent does not contend such expenses were not "ordinary and necessary," a point he successfully argued before this Court in a Court-reviewed decision squarely in point with the present case. See *Anaheim Union Water Co.*, 35 T.C. 1072 (1961), revd. 321 F. 2d 253 (C.A. 9, 1963). Therefore, the only question for decision is whether the expenses were paid or incurred in "any trade or business" within the intendment of section 162 (a).

Petitioner is a nonexempt, nonprofit corporation which owns and maintains approximately 50,000 acres of land in the Adirondack Forest region as a hunting and fishing preserve and pleasure resort. During each of the years in issue, the costs incurred by petitioner in these membership activities exceeded the amounts received therefrom. In addition, petitioner engaged in cutting and selling timber on its land from which it realized net gains during the years in issue. In computing its taxable income, petitioner deducted in full the expenses incurred in its membership activities thereby reducing the taxable timber income by the amounts by which the costs of its membership activities exceeded the income from its membership activities. Respondent allowed petitioner to deduct the expenses incurred in the membership activities only to the extent of the income derived from such activities,[2] and determined deficiencies in petitioner's income taxes based upon disallowance of deduction of the remainder of the expenses incurred by petitioner in its membership activities.[3]

It is plain from the record before us that the profits realized from the cutting and selling of timber were applied to offset the losses realized by petitioner in its membership activities and thereby eliminate the need to increase membership dues and/or the fees charged

---

[2] This position is consistent with respondent's position in the "hobby" cases. See sec. 1.162–12, Income Tax Regs.

[3] The result urged for by respondent in this case is what would follow if sec. 511 (a) (2) (A) were applicable to petitioner herein. These provisions do not apply, however, since the petitioner is not tax exempt and since in any event the tax on unrelated trade or business income does not apply to social clubs.

for use of the club facilities. In substance, the club distributed the timber profits to its members in the form of reduced membership dues and/or fees. However, the issue raised by the parties to this proceeding does not concern the existence of a constructive dividend but instead is restricted to a determination of whether the expenses incurred and paid by petitioner in its recreational activities, to the extent they exceed the income derived therefrom, are deductible under section 162(a).

In support of his contention that petitioner's activities relating to maintenance and operation of a fishing and hunting preserve and a pleasure resort do not constitute the carrying on of a trade or business within the intendment of section 162, respondent argues that to constitute a trade or business within the meaning of section 162(a), an activity must be carried on with a motive to profit and that motive must be the primary or dominant purpose. Petitioner, on the other hand, contends that, notwithstanding the absence of a profit motive, as a corporate taxpayer it is entitled to deduct all expenses incident to the ordinary and normal conduct of its corporate affairs as a social club to the extent such expenses are reasonable in amount.

Petitioner argues on brief that the term "trade or business" must be applied in light of the corporate "business" of the particular taxpayer. Accordingly, argues petitioner, items of expenditure which are ordinary and necessary to the achievement of the objectives of one corporation, and therefore deductible by that corporation, may not be deductible by another corporation with different corporate objectives. Petitioner's argument equates a corporation's trade or business with its objectives. Petitioner argues that where, as in the present case, expenditures are made in accordance with the corporate objectives, they are paid or incurred "in carrying on any trade or business" within the intendment of section 162(a), notwithstanding that the corporate objectives do not include a profit motive. Petitioner attempts to distinguish some of the cases cited by respondent on the ground that the issues therein involved the deduction of personal expenditures incurred by profit-motivated corporations. Petitioner agrees that personal expenditures of profit-motivated corporations are not deductible as business expenses but argues simply that Adirondack is a nonprofit corporation, and since the expenses in issue were incurred pursuant to the achievement of its corporate purposes, they are deductible as business expenses under section 162(a).

In support of his argument, petitioner relies upon three cases recently decided by the Court of Appeals for the Ninth Circuit. *Anaheim Union Water Co., supra; Bear Valley Mutual Water Co.* v. *Riddell*, 427 F. 2d 713 (C.A. 9, 1970); *San Antonio Water Co.* v. *Riddell*, 427

F. 2d 713 (C.A. 9, 1970). The facts of these three cases are virtually indistinguishable, each involving a nonprofit water company formed to develop water and water rights for the purpose of sale and distribution to their shareholders on lands within a limited area. Each company in acquiring land yielding water resources acquired properties which yielded substantial unrelated income, including oil and gas royalties, rents, and timber. Each company was thereby able to provide water to their shareholders at cost or below cost, the charges for water being the difference between income from all other sources and the expenses incurred by the companies. In their tax returns, the companies claimed as ordinary and necessary business expenses, the cost of acquisition and distribution of the water, offsetting these costs against income from all sources, and thereby resulting in little or no taxable income. Respondent contended the expenses incurred in providing water to the shareholders were deductible only to the extent of the income received therefrom and this Court upheld his determination on the ground that the disputed expenses, to the extent they exceeded the income received from the shareholders, were not "ordinary and necessary expenses." The Court of Appeals for the Ninth Circuit reversed after determining that "Anaheim's expenditures must be determined ordinary or not on the basis of what is ordinary for businesses of the nature and scope of Anaheim's."[4] Subsequently, in *Bear Valley Mutual Water Co.* v. *Riddell, supra,* and *San Antonio Water Co.* v. *Riddell, supra,* respondent abandoned his argument that the expenses in issue were not ordinary and necessary and argued instead that the expenses were not paid or incurred in carrying on any trade or business,[5] the same argument he advances in the present case. The court dismissed this argument and held for the taxpayer, relying upon its decision in *Anaheim Union Water Co., supra.*

We agree with petitioner that these cases are in all respects material herein indistinguishable from the present case. However, we are not bound thereby and insofar as they find a "business" within the meaning of section 162(a), despite the absence of any profit motive, we respectfully disagree therewith. This Court has consistently held a profit motive a prerequisite to "carrying on any trade or business" as used in section 162(a) and the predecessors to that section. See, e.g., *American Properties, Inc.,* 28 T.C. 1100 (1957), affd. 262 F. 2d 150 (C.A. 9, 1958), which position is in agreement with the weight of

---

[4] Respondent also advanced other arguments therein which are not relevant to the present case.

[5] In *Anaheim,* respondent did not argue the expenses were not paid or incurred in carrying on any trade or business. The Court stated: "It is not disputed that Anaheim during 1952–54 was carrying on a business—the furnishing and delivery of water to those of its shareholders who desired to purchase water."

authority on this issue. See, e.g., *International Trading Co.* v. *Commissioner*, 275 F. 2d 578 (C.A. 7, 1960); *American Properties, Inc.* v. *Commissioner*, 262 F. 2d 150 (C.A. 9, 1958). The cases cited directly above involved expenditures made by profit-motivated corporations which had incurred expenses in specific transactions or activities which respondent contended were not profit motivated. The taxpayers in those cases did not argue that profit motivation was not a prerequisite to deductibility as petitioner is contending herein. The issue in those cases was purely factual, i.e., whether the specific transactions or activities from which the expenses grew were profit motivated. There is no such factual question in the present case because the record clearly shows Adirondack was not profit motivated.

The only issue herein is whether a profit motive is a prerequisite to deductibility under section 162(a) for petitioner, a nonprofit social club. We hold that it is. In our opinion, for the purpose of applying section 162(a), there is no meaningful distinction between *American Properties, Inc.* v. *Commissioner, supra; International Trading Co.* v. *Commissioner, supra,* and the present case. Therefore, the requirement of a profit motive in the above-cited cases is equally applicable to the present case. Accordingly, since petitioner had no overall profit motive, the expenses in issue were not paid or incurred in any trade or business and are therefore not deductible.

As a second approach to our decision herein, we have examined the "exempt organizations" provisions of the Code and the cases thereunder, and have considered the effect on petitioner's case herein, if any, of respondent's initial grant of tax-exempt status and subsequent revocation thereof.

During the years at issue, respondent's regulations concerning the tax-exempt status of social clubs read as follows:

Sec. 1.501(c)(7)–1 Social clubs.

(a) The exemption provided by section 501(a) for organizations described in section 501(c)(7) applies only to clubs which are organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, but does not apply to any club if any part of its net earnings inures to the benefit of any private shareholder. In general, this exemption extends to social and recreation clubs which are supported solely by membership fees, dues and assessments. * * *

(b) A club which engages in *business*, such as making its social and recreational facilities available to the general public or by selling real estate, *timber,* or other products is not organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, and is not exempt under section 501(a). Solicitation by advertisement or otherwise for public patronage of its facilities is prima facie evidence that the club is engaging in business and is not being operated exclusively for pleasure, recreation, or social purposes. However an incidental sale of property will not deprive a club of its exemption. [Emphasis added.]

Under section 501(c)(7) of the Code, a social club which is organized and operated exclusively for pleasure, recreation, and other nonprofit purposes, no part of the net earnings of which inures to the benefit of any private shareholder, is exempt from income taxes. However, if the club engages in certain profit-making activities, such as those mentioned in respondent's regulations above, the club may lose its tax-exempt status.

Under section 501(c)(3), an organization organized and operated exclusively for religious, charitable, scientific, educational, etc., purposes, no part of the net earnings of which inures to the benefit of any private shareholder, is also exempt for income taxes. A different result follows, however, if an organization described under section 501(c)(3) engages in certain profit-making activities. The organization retains its tax-exempt status and is taxed separately on its "unrelated trade or business income."

Since the statutory scheme outlined above does not provide for a tax on the unrelated business income of section 501(c)(7) organizations,[6] the question arises whether, upon forfeiting its tax-exempt status because of engaging in certain proscribed profit-making activities, such organization, together with both its profit and nonprofit activities, is thereby considered a trade or business within the meaning of section 162(a). A literal interpretation of respondent's regulations cited above, wherein the phrase "engaging in business" is employed to describe the profit-making activities listed therein, would lead us to believe that respondent feels such an organization would in fact become a "business." Since the club is no longer tax exempt, and there is no separate tax treatment of its unrelated business income, and it is "engaging in business," the club would seem to be a "business" for tax purposes. This conclusion was apparently reached by the Court of Appeals for the Fifth Circuit in *United States* v. *Fort Worth Club of Fort Worth, Texas*, 348 F.2d 891 (C.A. 5, 1965). In that case, the taxpayer, a downtown men's club in Fort Worth, Tex., had previously been exempted from Federal income taxes as a social club. A wholly owned subsidiary of taxpayer owned a 13-story building, the top seven floors, and a part of the basement of which were used by the club for club purposes and the remainder was rented to commercial tenants. The subsidiary was required by its charter to make monthly payments to the club of all of its income less expenses which payments were used by the club to pay its general expenses and to reduce a substantial club debt. The payments received from the subsidiary were

---

[6] The Tax Reform Act of 1969 has altered the tax treatment of exempt social clubs which realized other than "exempt function income." Under the new provisions, a club's "exempt function income" remains exempt but all remaining income, including but not limited to income from an unrelated business, is subject to tax at corporate rates.

over half of the club's total receipts. Because of the substantial outside income, the Commissioner revoked his earlier rulings granting tax-exempt status on the ground that the club was no longer organized and operated exclusively for pleasure, recreation, and other nonprofit purposes. The District Court held the club was exempt, which decision was reversed on appeal. On petition for rehearing, the court held further that if the alleged club was to be taxed as a business enterprise, it was entitled to all the deductions and tax benefits of such an enterprise. The case was then remanded to the District Court to decide on the losses and financial adjustments urged by the taxpayer which the District Court did not consider at trial since it had held the taxpayer was exempt.

What the court apparently did in *Fort Worth Club* was to view the taxpayer together with the subsidiary and the activities of both as constituting a single taxable entity. Since the taxpayer was held not to be tax exempt, the court determined it was thereby taxable as a business enterprise and that therefore all its ordinary and necessary expenses pertaining to both types of activity were deductible in determining its taxable income.

To the extent that the decision in *Fort Worth Club* would support a determination in this case that all of petitioner's ordinary and necessary expenses are deductible, we respectfully disagree therewith. To permit petitioner to deduct the expenses in issue in this case would lead to absurd results both in the present case and other similar situations. In *Coastal Club, Inc.*, 43 T.C. 783 (1965), this Court held a corporation organized as a duck-hunting club which repeatedly leased its property for the exploration for and the production of oil and gas was not exempt from income tax under section 501(c)(7). In noting that the oil and gas lease income exceeded the amounts received from its members in the form of dues and service and guest charges and also supplied more than half of the amounts required and expended for operations, repairs, maintenance, and improvements, this Court felt that if the petitioner were held exempt under the statute, such holding would attribute an intent to Congress that in enacting section 501(c)(7), Congress "intended to subsidize the recreational activities of private clubs at the expense of the revenue and of other taxpayers generally to the extent of the income tax on earnings from unrelated activities. On the statute here applicable we are unable to attribute any such intent to Congress," *id.* at 822.

In a like manner we cannot attribute to Congress an intent that in enacting the exempt-organization provisions of the Code, a private club which forfeits its tax-exempt status because of certain proscribed profit-making activities could then subsidize the club activities with

those profits without paying income taxes thereon. To do so would favor private clubs such as Adirondack over religious, charitable, educational, etc., institutions, a result clearly not intended by Congress.[7]

In enacting section 277 [8] into law, Congress has supplied the legislative machinery to prevent membership organizations such as petitioner from escaping the tax on profitable business or investment activities in the manner attempted in this case. However, that section applies only with respect to taxable years beginning after December 31, 1970. Therefore, we have the question of whether this provision is a declaration of existing law or whether under existing law the deductions would be allowed. The Senate Finance Committee reported the following with respect to this question:

> In adopting this provision, the committee does not intend to create any inference as to the allowability under existing law of a deduction for the excess of such costs over income from members.

The underlying basis for the tax exemption granted to social clubs is their non-income-producing nature. Social clubs are viewed for tax purposes as devices for sharing, and in some instances minimizing, the recreational and entertainment expenses of its members. Viewed in this manner, provided the club's receipts come only from the membership, the club realizes no income in the economic sense.[9] On the other hand, if the club engages in business for profit, its purely non-income-producing nature disappears and the club may thereby forfeit its tax-exempt status as did Adirondack.

Because in the economic sense petitioner's recreational activity viewed by itself still produces no income, it is, in that sense, not a busi-

---

[7] In fact, the social club exemption provided for in sec. 501(c)(7) was fostered by the demands of administrative convenience since prior to the exemption, the Treasury Department's experience was that securing returns from such organizations was a source of expense and annoyance and resulted in the collection of no taxes or negligible amounts. H. Rept. No. 922, 64th Cong., 1st Sess., p. 4 (1916).

[8] SEC. 277. DEDUCTIONS INCURRED BY CERTAIN MEMBERSHIP ORGANIZATIONS IN TRANSACTIONS WITH MEMBERS.

(a) GENERAL RULES.—In the case of a social club or other membership organization which is operated primarily to furnish services or goods to members and which is not exempt from taxation, deductions for the taxable year attributable to furnishing services, insurance, goods, or other items of value to members shall be allowed only to the extent of income derived during such year from members or transactions with members (including income derived during such year from institutes and trade shows which are primarily for the education of members). If for any taxable year such deductions exceed such income, the excess shall be treated as a deduction attributable to furnishing services, insurance, goods or other items of value to members paid or incurred in the succeeding taxable year.

[9] The House Ways and Means Committee, in its report on the 1969 Tax Reform Act, stated the following: "Since the tax exemption for social clubs, for example, is designed to allow individuals to join together to provide recreational or social facilities on a mutual basis, without tax consequences, the tax exemption operates properly only when the sources of income of the organization are limited to receipts from the membership. Under such circumstances, the individual is in substantially the same position as if he had spent his income on pleasure or recreation without the intervening separate organization." H. Rept. No. 91-413 (Part 1), 91st Cong., 1st Sess. (1969), 1969-3 C.B. 231.

ness as indicated above. We therefore hold that the two activities must be viewed separately. Because the expense of recreation bears no relationship in an economic sense to petitioner's timber activity, which is a business in any sense, we hold that such expense is not deductible as against the income from its timber activity.

Our examination of the statutory scheme of the exempt organizations area of the Code, the legislative history thereof, including the underlying basis for the social club exemption and in consideration of the absurd results that would follow were petitioner to prevail in this case, are the grounds for deciding for respondent in our second approach to the very difficult issue present in this case.

Treating respondent's withdrawal of petitioner's tax exemption as applying equally to its nonprofit as well as its profit activities inevitably leads to the conclusion that *all* of its income is taxable and it would follow, because it thereby becomes a business under section 162 (a), that *all* of its expenses necessary to produce that income are deductible. The effect of this is to permit the deduction of petitioner's members' personal living expenses in the form of the cost of their recreation which is expressly prohibited by section 262. Another effect is brought about by the fact that, as indicated in *Coastal Club, Inc.*, *supra*, and other such cases, the lessened cost of recreation amounts to the distribution by petitioner, a corporation, of its earnings. To permit petitioner to deduct an expense equal to such lessened cost is in substance its deduction of dividends paid for which there is no statutory authority. We cannot attribute any such intent to Congress.

Reviewed by the Court.

*Decision will be entered for the respondent.*

———

RAUM, J., concurring: I agree with the result in this case, but for a wholly different reason, namely, that to the extent that the expenses incurred in the operation of petitioner's recreational facilities exceeded its revenues therefrom they failed to qualify as "ordinary and necessary" expenses and were therefore not deductible under section 162. The underlying support for this view was spelled out at length in our opinion in *Anaheim Union Water Co.*, 35 T.C. 1072. I recognize, of course, that our decision was reversed by the Ninth Circuit, 321 F. 2d 253; and if the present case were within that circuit we would be obliged to follow it here. Cf. *Jack E. Golsen*, 54 T.C. 742. But this case is appealable to the Second Circuit, and since I think that our own opinion in *Anaheim* was sound, I would articulate again the reason that led us to the conclusion therein, so that the matter might thus be brought into sharper focus. To be sure, the Commissioner has not relied upon that reason in this case, but it has been firmly

established that a deficiency may be approved on the basis of reasons other than those relied upon by the Commissioner and indeed even where his reasons may be incorrect. *Blansett* v. *United States*, 283 F. 2d 474, 478–479 (C.A. 8); *Bernstein* v. *Commissioner*, 267 F. 2d 879, 881–882 (C.A. 5); *Acer Realty Co.* v. *Commissioner*, 132 F. 2d 512, 514–515 (C.A. 8); *Alexander Sprunt & Son* v. *Commissioner*, 64 F. 2d 424, 427 (C.A. 4); *Crowell* v. *Commissioner*, 62 F. 2d 51, 53 (C.A. 6); *J. & O. Altschul Tobacco Co.* v. *Commissioner*, 42 F. 2d 609, 610 (C.A. 5); *Hughes* v. *Commissioner*, 38 F. 2d 755, 757 (C.A. 10); *Wilkes-Barre Carriage Co.*, 39 T.C. 839, 845–846, affirmed 332 F. 2d 421 (C.A. 2); *John I. Chipley*, 25 B.T.A. 1103, 1106; *Edgar M. Carnrick*, 21 B.T.A. 12, 21; cf. *Helvering* v. *Rankin*, 295 U.S. 123, 132–133.

I turn therefore to *Anaheim*. There, the taxpayer, a nonexempt water company, sold water exclusively to its shareholders at prices considerably below its expenses in relation thereto. However, it received substantial income from the successful exploitation of oil deposits in its property, and it fixed its water charges to its shareholders below cost in such manner that the excess of its water expenses over water revenues would be approximately equal to its oil profits. In effect, the corporation thus sought to avoid tax upon its oil income and concomitantly to distribute its oil profits tax-free to its shareholders by charging them less than cost for the water that it was selling to them. We sustained the Commissioner's determination to the effect that to the extent that the water expenses exceeded the water revenues they were not deductible. In so holding, we said (35 T.C. at 1076–1077):

Although the question for decision has been variously stated by the parties from time to time—and subtle differences may perhaps be thought to turn upon the form of the statement—we think that the real issue before us is whether the water costs or expenses incurred by Anaheim are ordinary and necessary expenses on this record to the extent that they exceeded the amounts which Anaheim obtained for such water from its shareholders. We hold that to the extent of such excess they do not qualify as "ordinary and necessary" expenses.

The question is not whether such expenses might be "ordinary and necessary" in other situations. The question rather is whether such expenditures in this case, known in advance to be in excess of what the corporation would obtain for the water sold to its shareholders, can fairly be classified as "ordinary and necessary." We think that they are neither "ordinary" nor "necessary." Indeed, it appears to us to be "in a high degree extraordinary," cf. *Welch* v. *Helvering*, 290 U.S. 111, 114, for a corporation to incur business expenses in connection with goods or services in an amount greatly in excess of what it knows it will obtain for such goods or services. To be sure, exceptional circumstances may exist in other situations that would justify the deduction where expenses exceed anticipated income. For example, extraordinarily large outlays may be made

by a business when introducing a new product where the reasonable expectation exists that sales in later years will more than compensate for losses in the early years. But no such exceptional circumstances exist here. In essence, the entire setup is merely a device to distribute the oil and other unrelated income to the shareholders. Although Anaheim was clearly not incorporated for that purpose in 1884, the fact nevertheless remains that it has been used for that purpose in recent years.[2] Cf. *United States* v. *Joliet & Chicago Railroad Co.*, 315 U.S. 44, where the controlling indenture was executed in 1864. And we are of the opinion that the water expenses incurred herein in excess of the amounts which the directors reasonably expected to obtain for the water were not "ordinary and necessary" expenses, but were merely part of a plan to distribute otherwise taxable income to the shareholders. [Footnote omitted.]

Notwithstanding the Ninth Circuit's reversal I think that reasoning is correct, and that it finds at least some support in such cases as *International Trading Co.* v. *Commissioner*, 275 F. 2d 578 (C.A. 7), where expenses incurred by a corporation in respect of certain lakeside property leased to its principal shareholders exceeded the rents therefrom. The Seventh Circuit disallowed the claimed deduction of the difference between the expenses and rent as an ordinary and necessary expense, stating (p. 585) "the property was purchased and improved with the knowledge that it would not earn a profit, and was not expected to earn a profit, but was maintained primarily for the personal benefit of the families of the corporation's stockholders, without a corresponding benefit to the corporation."

Although there may be differences in detail, the instant case presents substantially the same situation as was before us in *Anaheim*. Here, petitioner deliberately determined the rates it would charge for its recreational facilities in such manner that they would inevitably yield revenues in an amount less than the expenses incurred to produce such revenues, and the difference was absorbed by the profits from its lumber business. I cannot believe that the statute was ever intended to support the bizarre result for which petitioner seeks approval here; to the extent that the expenses exceeded the revenues from the recreational facilities they were not "ordinary and necessary" within the meaning of the governing statutory provisions.

SCOTT, HOYT, TANNENWALD, and SIMPSON, *JJ.*, agree with this concurring opinion.

---

DAWSON, *J.*, concurring: Irrespective of whether the expenses relating to the maintenance and operation of petitioner's fishing and hunting preserve and pleasure resort were "ordinary and necessary," I think Judge Withey has hit the nail squarely on the head by answering the threshold question: Did petitioner's nonprofit motivated recreational activities constitute "carrying on any trade or business" within the meaning of section 162(a)? I agree that the correct answer

is "No," and it is in support of such conclusion that I make the following comments.

In my view it is an absolute requirement under section 162(a) that allegedly deductible expenses be paid or incurred in carrying on a profit-motivated activity. Section 162 allows deduction of ordinary and necessary expenses of carrying on trade or business, in computing taxable income under section 63(a). An expense is not deductible under section 162(a) if it is not incurred in carrying on trade or business. To constitute trade or business within the meaning of section 162(a) an activity must be carried on with a motive to profit, and that motive must be the primary or dominant purpose. The courts, including the United States Supreme Court, have affirmed that principle in a virtually unbroken line of decisions, beginning with the decision in *Flint* v. *Stone Tracy Co.*, 220 U.S. 107 (1911), under the Corporation Excise Tax Act of 1909. See also *Von Baumbach* v. *Sargent Land Co.*, 242 U.S. 503, 514 (1917); *Brooks* v. *Commissioner*, 274 F.2d 96 (C.A. 9, 1959); *Hirsch* v. *Commissioner*, 315 F.2d 731 (C.A. 9, 1963); *Teitelbaum* v. *Commissioner*, 346 F.2d 266, 269 (C.A. 7, 1965); *Lamont* v. *Commissioner*, 339 F.2d 377, 380 (C.A. 2, 1964); *Schley* v. *Commissioner*, 375 F.2d 747 (C.A. 2, 1967); *Szmak* v. *Commissioner*, 376 F.2d 154 (C.A. 2, 1967); and *Bessenyey* v. *Commissioner*, 379 F.2d 252, 256 (C.A. 2, 1967).

In *Hirsch* v. *Commissioner*, *supra* at 736, the Court of Appeals gave this explanation of the profit motive aspect of carrying on a trade or business, together with its linkage to a tax on *net* income and to section 162(a):

the warp and woof of the definitions of "carrying on any trade or business" as used in Section 23 [the 1939 Code predecessor of Code section 162(a)] and elsewhere in the Act, is that the activity or enterprise claimed to constitute "carrying on a business" be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income therefrom. * * *

From the very import of Section 23, which presupposes that the taxpayer has received taxable income before deductions can be taken therefrom, *it is clear that Congress intended that the profit or income motive must first be present in and dominate any taxpayer's "trade or business" before deductions may be taken.* * * * the basic and dominant intent behind the taxpayer's activities, *out of which the claimed expenses or debts were incurred,* must be ultimately to make a profit or income from those very same activities. * * * Absent that basic and dominant motive, the taxpayer's activities, no matter how intensive, extensive or expensive, have not been construed by the Courts as carrying on a trade or business within the purview of Section 23. * * * [Emphasis supplied.]

See also *United States* v. *Gilmore*, 372 U.S. 39, 46 (1963), where the Supreme Court said it is clear that "the only kind of expenses deductible" under section 23(a)(1)(a) (now section 162(a)) are those that "relate to a 'business,' that is, profit-seeking, purpose."

This judicial construction of the term "business" conforms to the evidence of congressional intent in the formative years of the income tax.[1] It is also implicit in the scheme of the Federal income tax.[2]

It is clear from the facts of this case that the petitioner, in carrying out its purpose "as a fishing and hunting preserve, and as a pleasure resort for the use of its members," was not engaged in a "business" within the intendment of section 162(a). It is equally clear that petitioner's practices were intentionally designed to benefit its member-shareholders through the application of petitioner's lumber business to the recreational purposes of the club. Rather than raise dues for the recreational activity, which petitioner had the authority to do, additional lumber was cut so that the profits accruing therefrom could be applied to reduce the recreational deficits. Unquestionably the lumbering profits were used to benefit petitioner's members. Cf. *Coastal Club, Inc.*, 43 T.C. 783 (1965), affirmed per curiam 368 F. 2d 231 (C.A. 5, 1966).

Whether an activity constitutes the carrying on of a trade or business within the purview of section 162(a) depends upon whether such activity is conducted in good faith with the intention of making a profit. *International Trading Co.* v. *Commissioner*, 275 F. 2d 578, 583–584 (C.A. 7, 1960); see also *Samuel Yanow*, 44 T.C. 444 (1965), affirmed per curiam 358 F. 2d 743 (C.A. 3, 1966).

Petitioner would have us define the term "trade or business" not as an activity entered into with the intent of making a profit, which is the law,[3] but in the context of whether the corporation is fulfilling its particular corporate purpose. The error in petitioner's proposition is that it equates the word "purpose" with "business," and that is wrong. The term "trade or business" is not a variable to be determined

---

[1] Early congressional meaning of the term "business" is reflected in the enactments of the Civil War era, the 1894 Act and the 1909 Act. See, e.g., the House and Senate comments on the Excise Bill of 1912, which would have extended the Corporation Excise Tax Act of 1909 to the carrying on of business by individuals. H.R. 21214, 62d Cong., 2d Sess. (1912); 48 Cong. Rec. 9678 *et seq.* In *Flint* v. *Stone Tracy Co.*, 220 U.S. 107, which upheld the validity of the 1909 Act, the Supreme Court expressed its view of "business" as being "That which occupies time, attention, and labor of men for the purpose of a livelihood or profit." It is noted that the definition of "business" as set forth in the 1912 Excise Bill with respect to individuals is similar to the Supreme Court's definition of that term. See also *Higgins* v. *Commissioner*, 312 U.S. 212 (1941).

[2] In the scheme of the tax the obvious purpose of Congress is to tax *net* business income. The business expense deduction provided in sec. 162 is a reflection of that purpose, and its manifest function is to assist in the determination of *net* business income. Obviously, expenses not connected with profit endeavors have no relevance to a determination of net income from profit-motivated endeavors, and their allowance, therefore, is inconsistent with and distorts, rather than assists, in the determination of *net* business income.

[3] See *Everett R. Taylor*, T.C. Memo. 1969–186, where this Court recently said: "The sine qua non of a trade or business as described in section 162 is the existence of a profit motive. * * * the cases are consistent in holding that a profit motive of some description is a prerequisite to the finding of a trade or business." Of course, the evidence herein is uncontroverted that the recreational activity carried with it no profit motive of any description.

in the context of diverse purposes. Such term must be given a logical meaning, and the law is well established that its meaning is definable in the context of a profit motive.

Probably the core of petitioner's misconception is the failure to recognize that besides being instruments through which individuals conduct their commercial endeavors for profit, corporations are also the mechanisms by which individuals govern themselves, practice their religion, provide their recreation, advance their political views, promote their social beliefs, and many other activities identified with their personal life which are undertaken without motive of profit or gain to those on behalf of whom such activities are conducted.

Congress provided in section 501(c)(7) that social clubs should be exempt from income tax only if "operated exclusively for pleasure, recreation, and other nonprofitable purposes." A club which engages in business and derives income from such activities as making its recreational facilities available to the general public or by selling real estate, *timber*, or other products is not exempt under section 501(c)(7). See sec. 1.501(c)(7)–1(b), Income Tax Regs., *Aviation Club of Utah*, 7 T.C. 377 (1946), affd. 162 F.2d 984 (C.A. 10, 1947). Thus, if we should allow this petitioner to deduct its excess recreation expenses from its lumber profits, it is obvious that the statutory scheme would be nullified and the business income of social clubs could easily escape taxation. Any social club that desired to engage in profit-motivated activities with nonmembers could relinquish any claim of exemption and eliminate any profit derived from nonmember profit-motivated activities by the simple device of spending such profits on nonprofit-motivated activities for the pleasure and benefit of its members. Certainly Congress never intended such a result.

The congressional intent to distinguish between types of activities for business expense deduction purposes is further reflected in statutory provisions which tax part of certain income of exempt corporations. Sections 511–514 of the Code require tax-exempt charitable and educational organizations, business leagues, etc., to pay tax on their "unrelated business taxable income." The latter term is defined in section 513(a) as meaning—

any trade or business the conduct of which is not substantially related * * * to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption * * *

Section 512(a) defines "unrelated business taxable income" as meaning—

the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of *such* trade or business * * * [Emphasis supplied.]

It is apparent that these provisions separate the nonexempt activity from the exempt or nontaxable activity and explicitly limit business expense deductions in respect of the taxable activity to those business expenses which are "directly connected with the carrying on of *such* trade or business" (Emphasis supplied.) If the business expense deductions of an exempt organization are limited to the expense it incurs in carrying on its taxable activity, it logically follows that Congress could not have intended a more favorable tax treatment of nonexempt nonprofit corporations engaged in part in business activities and in part in nonprofit-motivated activities.

If the law is that a *non*exempt organization may deduct the expenses of a nonprofit activity from business income, it follows that *non*exemption is decidedly more advantageous than exemption as to those charitable organizations, business leagues, etc., whose expenses in carrying on their exempt activity exceed their income therefrom. Nonexemption would permit them to pay tax only upon their unexpended income, as contrasted with the net income which is taxable to others. It would give such corporations not only all the deductions and allowances authorized for taxable profit corporations, but also an additional deduction for whatever amounts of taxable income they consume in conducting the personal and mutual functions for which they were organized.

I think we have a responsibility to prevent the malfunctioning of section 162(a) in the manner urged by the petitioner in this case. Otherwise the net effect would be to permit the offset of taxable income by consumption at the corporate level for personal functions of the members. As previously stated, the result would be clearly contrary to congressional intent underlying the scheme of the corporation income tax. In my judgment the rationale advocated by respondent herein is legally sound and should be adopted by this Court.

HOYT and SIMPSON, *JJ.*, agree with this concurring opinion.

———

TANNENWALD, *J.*, concurring: I fully agree with Judge Raum's concurring opinion. I am concerned that the majority opinion herein may be misinterpreted and misapplied. In the instant case, respondent has only sought to disallow the excess of the deductions over income attributable to the petitioner's recreational activities. It seems to me of importance to emphasize that the majority opinion addresses itself only to that situation and not to the question whether if the petitioner is considered not to have carried on a trade or business with respect to its recreational facilities, it would be permitted to deduct the expenses of such activity, at least to the extent of the payments received

from its members for the use of such facilities, or would be denied any deduction whatsoever for such expenses. By determining what constitutes a trade or business for each of petitioner's activities, the majority opinion not only accentuates the difficulties in dealing with this question but also may be inviting problems in other areas of legitimate business activities. The rationale of *Anaheim Union Water Co.* avoids these difficulties and problems.